**STATE**

**v.**

**James S. RICHARDSON.**

**No. 2010–216–C.A.**

Supreme Court of Rhode Island.

July 12, 2012.

 

Virginia M. McGinn, Department of Attorney General, for State.

Robert J. Caron, Esq., for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

The defendant, James S. Richardson, appeals to this Court after he was convicted by a jury of first-degree murder and burglary. After the jury returned its verdict, the trial justice sentenced the defendant to a prison term of life without the possibility of parole. Before us, the defendant argues that his conviction should be vacated because the trial justice impermissibly allowed an expert witness called by the state to bolster the testimony of another of the state's expert witnesses. He also argues that the trial justice erred when he denied his motions for judgment of acquittal and for a new trial. We affirm the judgment of conviction.

## I

## Facts and Travel

The victim in this case, Margaret Duffy–Stephenson (Margaret), joined with other members of her family at her younger brother's wedding in Florida on November 12, 2005. The day after the wedding, Margaret returned home with her parents and another brother while her husband and her three-year-old son remained in Florida.[1] On Sunday evening, Margaret's family dropped her off at her Warwick home and watched her until she safely entered the house.

During the next week, Margaret dutifully showed up at work on Monday, Tuesday, and Wednesday. She also attended a banquet for school support staff on Wednesday evening with a coworker. However, when Margaret did not arrive at work on Thursday, the teacher for whom she was an assistant tried to contact her; it was not in keeping with her conscientious nature for her to fail to show up without calling in to inform her employer that she

---

1. Margaret was a teaching assistant at Cole Junior High School in East Greenwich, and she had planned to return home early so she could be at work on Monday morning. Mr. Stephenson and the couple's son remained in Florida to celebrate the 98th birthday of Mr. Stephenson's grandfather.

would be absent. The teacher was unable to reach Margaret on that Thursday, and concern was heightened when she failed to appear at work on Friday, as well.[2]

Those concerns prompted Margaret's husband, who was still in Florida, to telephone her parents. After receiving his son-in-law's call, John Duffy drove to Cole Junior High School in East Greenwich to look for his daughter's vehicle. When he was unable to locate Margaret's car, the worried father drove directly to her home. Mr. Duffy saw her vehicle in the driveway; he approached her home and proceeded to the back of the house, where the main entrance was located. Out of the corner of his eye, Mr. Duffy noticed that both of the bulkhead doors were open.

Mr. Duffy knocked on the locked door and called out his daughter's name, but there was no response. He then entered the house through the open bulkhead doors and walked through the basement. At the basement stairs, he looked up and saw that the door to the ground floor was open. As he walked up the stairs, he heard an alarm clock ringing and the dog barking. When he arrived upstairs, Mr. Duffy was horrified to see his oldest child and only daughter lying at the bottom of a set of stairs that led up to the second floor. Margaret's body was face up, her throat was slashed, and she was soaked in blood.

About six years earlier, Margaret's husband had begun a residential landscaping and gardening business. At first, he worked alone, but in the spring of 2000, due to the growth of his business, he contacted a company from which he hired temporary employees. One of those temporary workers was defendant. By the year 2000, Mr. Stephenson had hired defendant to work for him on a regular basis, five days a week. Mr. Stephenson often paid defendant with cash that was withdrawn from a safe in the basement of the Stephenson home. The defendant knew where the safe was because he had helped Mr. Stephenson move it after the basement had flooded.[3]

In the early spring of 2001, defendant had become part of Mr. Stephenson's payroll and worked for him in some capacity, often full-time, up until the spring of 2005. But, over time and as a result of a newly hired employee, defendant's hours were drastically reduced, and he worked only a total of eight to ten days during the spring and summer of 2005. In August 2005, defendant traveled to the Philippines to marry his girlfriend, whom he had met online, and he remained in that country until the beginning of October 2005. After he returned from the Philippines, defendant told Mr. Stephenson that he had "spent all of his money on his trip," so he began to perform "handyman work" around the Stephenson home to earn extra income.

The defendant told Mr. Stephenson that he was planning on returning to the Philippines in early November to live with his

2. After receiving a telephone call from Mr. Stephenson, a teacher with whom Margaret worked went to Margaret's house to check on her on Friday. The teacher observed that the side gate was open and that the cellar doors were wide open, as well. She called out for Margaret but received no response. The teacher returned to the school and spoke with Mr. Stephenson again. Mr. Stephenson told the teacher where the spare set of keys was located so that she could enter the house to check on Margaret. When two teachers returned to the house, they encountered Mr. Duffy, Margaret's father.

3. Mr. Stephenson testified at trial that the safe could be opened by either a combination lock or by keys. As of November 10, 2005, Mr. Stephenson testified that there was a total of $10,660 in the safe. He further testified that the cash consisted primarily of $100 bills.

new wife. To commemorate his departure, the Stephensons treated defendant to a meal at a Chinese restaurant on November 8. However, at dinner that night, defendant informed the couple that he was deferring his trip to the Philippines because of insufficient funds; as a result, he planned to remain in Rhode Island until he could earn enough money to return. After learning that defendant would not be leaving, Mr. Stephenson asked defendant to do some work inside and outside the house while the family was in Florida attending the wedding.

Because the couple had arranged for a woman who worked at their son's daycare to stay at their home to care for their animals,[4] Mr. Stephenson instructed defendant to call ahead or knock on the door if he was going to come into the house so that he would not frighten her.

The house sitter later testified at trial that on November 12, defendant had knocked on the door, entered the house and gone to the basement. She said that defendant stayed for about a half hour, and that while he was in the basement, she heard him using some type of power tool. The house sitter further explained that before she left the house to get something to eat that day, she put the dog in his cage, secured the cat in the basement, and locked all the doors to the house. When she returned a half-hour later, she noticed that the cat was outside; in an effort to determine how the cat could have gotten out, she looked through the house and noticed that the bulkhead doors were open. She closed the bulkhead doors and locked them from the inside.

On the morning of Sunday, November 13, the house sitter was awakened by the sound of a leaf blower. She looked out the window and saw defendant working in the yard; later in the day, he entered the house and went down into the basement area for approximately ten minutes. At 8 p.m. on Sunday night, the house sitter, knowing that Margaret would be returning, left a note for her, locked up the house, and left.

Detective Barbara Frazier, a Warwick police detective who was a member of the crime scene investigation unit, described the condition of the house after Margaret's body was discovered. After putting up a crime-scene tape around the perimeter of the house and securing the scene, the detective observed that the only damage to the property was to the outside frame of the bulkhead doors that led to the basement. She also observed that there were no signs that the house had been burglarized,[5] and that a large screen television and jewelry were undisturbed. Blood transfer stains also were discovered in the downstairs bathroom and the basement of the house.[6]

Detective Frazier also testified that she contacted the medical examiner's office and observed Margaret's body as it was being prepared for transport. She said that she watched an agent from the medi-

4. Mr. Stephenson testified that defendant had been the caretaker of the animals numerous times in the past and that he knew the location of the exterior house key and, in fact, had suggested that it be hidden inside the garden shed.

5. Detective Frazier testified that when she did her first walk through of the house, she was not aware that there was an office in the basement of the house because clothes were

hanging in its vicinity and it appeared to her to be a closet.

6. A civilian criminologist later testified that by using a bloodstain analysis, he was able to determine that the attack occurred at the base of the stairs leading to the second floor, and that it was contained to the foyer area. He also testified that the transfer stains and swipe marks indicated that after the fatal assault, the attacker proceeded to the basement.

cal examiner's office place Margaret's body in a "pouch" and position two brown paper bags under Margaret's hands and tape the bags around her wrists to protect any evidence.[7] She said that she was present during the autopsy of Margaret's body, and she saw the medical examiner remove the bags from Margaret's hands and then clip and bag Margaret's fingernails. The detective also testified that trace evidence was found on Margaret's body and in the pouch into which her body had been placed. In the pouch, the detective discovered hair samples. Significantly, after the autopsy, the lab found biological evidence underneath the fingernails of Margaret's hands.

Detective Timothy Grant described the ransacked basement office and the open safe, its contents emptied but for a few papers. He soon concluded that the crime was not a random act. Based on the hidden nature of the office and the safe, the presence of a dog in the house, and the lack of any evidence of forced entry, the police determined that the perpetrator was familiar with the house. On November 18, the police spoke with Mr. Stephenson and asked him who might have known where the safe was. As a result of the conversation with Mr. Stephenson, defendant became a person of interest in the case. At approximately 6 p.m. on November 18, defendant voluntarily came into police headquarters where he was advised that he was a potential suspect in a crime and he was read his Miranda rights.[8]

During the interview, detectives asked defendant about his connection with the Philippines. He told the detectives that he had planned to return to the Philippines to be with his new bride, but that he could not afford the airfare. He said that his wife had become pregnant during his last visit, and that she recently had become ill. Therefore, he explained that on November 18 he had purchased a plane ticket for a flight that was scheduled to leave on November 19 so that he could be with his wife during her illness. He told the police that the cost of the airplane ticket was $2,600. The defendant explained that because he did not have a bank account or a credit card, he had given his daughter $2,600 in cash, and that she purchased the airplane ticket with her credit card.

The detectives became suspicious about defendant's means to pay for the ticket and asked him how he suddenly was able to afford a very expensive plane ticket that a week earlier he could not afford. The defendant responded that he had been saving money, that he had received $500 cash from his parents as a wedding gift, and that he had recently sold "stuff." At that point in the interview, the detectives noticed that defendant became visibly nervous, avoided eye contact, and began fidgeting in his seat. The defendant admitted that he knew the location of the safe and he told the police that it was his understanding that the Stephensons had been planning to return home from their trip on November 20. When asked about his own whereabouts on November 16, defendant told police that he had been at home all day cleaning with his mother, that at night he had retired to his room, and that he had been on his computer from 9 p.m. until 9

---

7. State's witness Sharon Mallard later testified that in the event that the medical examiner suspects that there may have been a struggle associated with a death, nail clippings often are collected to enable the lab to see whether any biological material can be found underneath the fingernails.

8. A detective testified at trial that defendant never was told what crime he was a suspected of and, significantly, defendant never asked about why he had been asked to go to the police station.

a.m. the following day.[9] During the interview, defendant consented to being photographed and fingerprinted. One detective testified that he noticed that defendant had small scrapes on his arms, a scratch on the left side of his nose, and irritation on his left earlobe, neck, and chin.

A search warrant was issued on November 22, authorizing the seizure of DNA from defendant. Based on the search warrant, hair samples and a DNA swab were collected.[10] A sample of defendant's hair was compared to the "unknown" samples[11] that were found on Margaret's body and in the body pouch. A criminologist at the crime lab testified that she was not able to identify hairs to a particular person to the exclusion of all others. However, she testified that she was able to say that of the five unknown samples of hair, four were consistent with the known sample of defendant's hair.[12] After comparing defendant's DNA to the DNA recovered from underneath Margaret's fingernail, police prepared an arrest warrant for defendant for burglary and for the murder of Margaret Duffy–Stephenson.[13]

The state also called Steve Trimarco, who had shared a prison cell with defendant for twenty one days.[14] Trimarco testified that after asking defendant how the victim was killed, defendant responded "I stabbed her." He also testified that defendant told him that he had planned to rob his boss' house while the family was away in Florida because he knew there was a safe in the basement with money in it. Trimarco said that defendant said that every time he went to the house, there was a girl there watching the dog, so he would "do stuff around the house to make it look like he was there for some reason." He told Trimarco that to look busy while he was at the house and not arouse the suspicions of the house sitter, he did some landscaping work around the house and he built a platform for a washer and dryer in the basement.

Trimarco also said that defendant also had told him that one day he went into the house using a spare key and he "saw a note on the counter that the girl who was watching the dog had left saying that she would see [Margaret] Monday and give her the key back then and he left * * *." He did that, he explained, because a neighbor had seen him there at that time, so he planned to return to the house later that night. He also said that defendant told

---

**9.** Testimony at trial revealed that, in fact, defendant's computer was turned off from 8:28 a.m. on November 16 until 6:28 a.m. on November 17.

**10.** Detective Frazier testified that she removed a hair sample from defendant's scalp along with samples of hair from defendant's arm. She also said that she took a DNA swab from inside of defendant's mouth. Explaining, she said she scrubbed the inside of his cheek to gain a sample of skin cells.

**11.** An unknown sample is a biological source from a piece of evidence that the police submit for testing. A known sample is a DNA sample of which the origin is known.

**12.** One of two hairs from inside the body bag was consistent with defendant's known sample, and three of seven hairs found in the bathroom were consistent with defendant's known sample.

**13.** The defendant was indicted by a grand jury, which charged him with burglary and the murder of Margaret Duffy–Stephenson. The indictment was filed on March 20, 2006. In June 2007, defendant's first trial resulted in a hung jury. The defendant's second trial began in October of 2008.

**14.** Trimarco and defendant were placed in a cell in segregation; the witness testified that as a result they spent twenty-three hours a day together. He said that because prisoners in segregation have no magazines, newspapers, or televisions, the two talked frequently during the day.

him that when he did return, he went to the basement, where he knew the safe was located, and he began to look for the combination, which he eventually found. The defendant said that he made no effort to be quiet, because he did not think anyone was in the house. When he heard somebody coming, he went to investigate. It was at that time that he encountered Margaret and "did what he had to do because he [did not] want to go to prison."

Sharon Mallard, a forensic scientist in the forensic biology and molecular biology department at the Department of Health for nine and a half years, testified as an expert witness at trial on behalf of the state. She testified that blood was found under all Margaret's nails. She said that the blood under nine of the nails contained only Margaret's DNA. With respect to the tenth nail, however, labeled as "nail number five" she said that she found a "mixture"[15] of DNA. The mixture, she said, was a combination of Margaret's DNA and that of a male. After comparing a known DNA sample from defendant's cheek swab, Mallard testified that in her opinion, the source of the DNA found under nail number five excluded 99.9993462 percent of the Caucasian population.[16] It was her further opinion, that defendant was among the infinitely small percentage of Caucasians who could not be excluded.

While undergoing a rigorous cross-examination, Mallard acknowledged that an external audit had been conducted at her office in July 2006, and that the auditors became concerned that the lab had not been applying the combined probabilities of exclusion statistic correctly. Therefore, Mallard explained, the lab further reviewed the evidence in this case and amended the results of the testing to more precisely conform to the auditor's recommendations.[17] Mallard clarified that after the reviewing the findings of the audit, she realized that the lab should not have included defendant's last two alleles[18] in the exclusion statistic calculation.[19] The defense vigorously cross-examined Mallard, suggesting that when she performed the testing in November 2005, she "was not experienced enough to do this stuff."

The state also called Dr. Carl Ladd, an employee and supervisor at the Connecticut Forensic Laboratory for approximately sixteen and a half years, as another expert witness. Although Dr. Ladd was called to testify primarily on the issue of blood transfer, the state also questioned him about the DNA testing methods used to establish the DNA profile in the case. Ladd testified that he had worked in the DNA section of the lab for almost fourteen years and was the person in charge of the technical operation of the DNA unit.

15. Mallard explained that a mixture of DNA means that more than one person was the source of the DNA.

16. The database used by the Rhode Island Department of Health was generated by the Federal Bureau of Investigation, and includes a United States Caucasian population. The female sample of DNA contained underneath nail number five belonged to Margaret.

17. As a result of the second report, the percentage of the Caucasian population other than defendant that could be excluded as possible contributors to the blood sample found

under nail number five was adjusted from 99.9999715 percent to 99.9993462 percent.

18. An allele is "[a]ny one of a series of two or more different genes that may occupy the same [location] on a specific chromosome." Stedman's Medical Dictionary 50 (28th ed. 2006).

19. Mallard testified that the combined probability of exclusion statistic is a mathematical representation that represents "the percentage of a population that can be excluded from being a contributor to a[DNA] mixture."

The defense objected to the witness's testimony about the DNA testing methods, and argued that Dr. Ladd was being offered to bolster Sharon Mallard's testimony. Defense counsel insisted that there was no evidence in the record that would suggest that rehabilitation was necessary with respect to Mallard's testimony. Specifically, the defense argued:

"My understanding is that this witness is more than qualified to talk about how DNA can be transferred. I don't have a problem with that, but it looks like we are also going to present this witness as some supplemental approval of Sharon Mallard's examination in the process of what she did. I have not done or presented any evidence to suggest that rebuttal is necessary concerning Sharon Mallard's testing so I think to call this witness * * * [is] improper."

In response, the state argued that the entire cross-examination of Mallard "was a challenge to the results and the methodology and the procedure and the statistical analysis and the lab qualifications," and to the extent DNA played a role in the evidence, the state argued Dr. Ladd's testimony was relevant. The trial justice allowed the testimony of the witness, reasoning that it was "another opinion based on further examination subject to [the] right of cross examination."

Doctor Ladd testified that he reviewed personally the reports and conclusions of Sharon Mallard so that he could determine for himself the appropriateness and sufficiency of the methodology that she used in her analysis. Doctor Ladd testified that he "agreed in large part with the conclusions" in Mallard's reports. Critically, Dr. Ladd testified that he did not believe the differences between Mallard's first and second report affected her conclusion that defendant was among an extremely small percentage of the Caucasian population that could not be excluded as the male source of the DNA from underneath nail number five. Specifically he explained that his opinion differed slightly from that of Mallard because he would have excluded one allele that Mallard had included in her analysis after he determined that it was only a "stutter" and was not, in fact, an allele.[20] Doctor Ladd also explained that the amended report prepared by Mallard after the audit was "the superior way to do it." Doctor Ladd further testified about DNA transfer and explained that DNA from casual contact is rarely found underneath the fingernails of a murder victim.

At the close of the state's case, defendant moved for judgment of acquittal, which motion the trial justice denied. The defense then presented the testimony of defendant's daughter, who had purchased the plane ticket for him, and defendant's mother, who testified that she was a light sleeper and that she did not hear anything unusual on the night of November 16 or the early morning of November 17. The defense also called defendant's son's girlfriend who testified that she ate dinner with defendant and his son on the night of November 16 and that while watching a movie with her boyfriend, she saw defendant come down from his bedroom around 10:30 p.m. to get something to eat and drink.

After the defense rested, it renewed its motion for judgment of acquittal, and again the trial justice denied it. On November 14, 2008, the jury found defendant guilty on one count of murder and one count of burglary. The jury also made a

20. Specifically, Dr. Ladd testified that under nail number five, "there is a 21 in brackets that was left in as a called allele. I think it should be removed * * * [b]ecause it's a stutter."

finding that Margaret's death involved aggravated battery and torture. Thereafter, the trial justice sentenced defendant to life without parole. The defendant timely appealed to this Court.

## II

### Standard of Review

■ In our review of the trial justice's ruling pertaining to Dr. Ladd's testimony, "we are guided by this Court's familiar prescription: 'We will not disturb a trial justice's evidentiary ruling without first determining that the ruling constitutes a clear abuse of his or her discretion.'" *State v. St. Michel*, 37 A.3d 95, 100 (R.I.2012) (quoting *State v. Johnson*, 13 A.3d 1064, 1066 (R.I.2011)). "[T]his Court will not disturb the trial justice's ruling unless the abuse of discretion resulted in prejudicial error." *Id.* With respect to defendant's motion for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure, "we apply the same standard as applied by the trial justice." *State v. Brown*, 9 A.3d 1232, 1237 (R.I. 2010) (citing *State v. Caba*, 887 A.2d 370, 372 (R.I.2005)). Consequently, "we 'view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses and draw all reasonable inferences that are consistent with guilt.'" *Id.* (quoting *State v. Henshaw*, 557 A.2d 1204, 1206 (R.I.1989)). "If, after viewing all of the evidence, 'the inferences drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for judgment of acquittal must be denied.'" *Id.* (quoting *State v. Hornoff*, 760 A.2d 927, 932 (R.I.2000)). As for defendant's motion for a new trial, "[a] trial justice's ruling * * * will not be overturned unless the trial justice was clearly wrong or unless he or she overlooked or misconceived material and relevant evidence that related to a critical issue in the case." *St. Michel*, 37 A.3d at 100 (quoting *State v. Cerda*, 957 A.2d 382, 386 (R.I. 2008)).

## III

### Analysis

#### A. Dr. Ladd's Testimony

■ The defendant argues that the trial justice erred when he permitted the state to elicit testimony from Dr. Ladd, a second expert witness, about Mallard's DNA analysis and her ultimate findings and conclusions. The defendant contends that Dr. Ladd's testimony constituted impermissible "vouching" or "bolstering" of Mallard's testimony because, he argues, the witness relied exclusively on Mallard's reports and did not engage in his own independent examination of the physical evidence. The state, on the other hand, argues that Dr. Ladd's testimony was a permissible expert opinion that was founded on his analysis of the objective data contained in Mallard's reports. After reviewing the record and the applicable law, we cannot say that the trial justice abused his discretion when he permitted Dr. Ladd to testify about the DNA analysis performed by Mallard.

■ It is axiomatic that "[t]he determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury." *State v. Lassiter*, 836 A.2d 1096, 1107 (R.I.2003) (quoting *State v. Webber*, 716 A.2d 738, 742 (R.I.1998)); *State v. Haslam*, 663 A.2d 902, 905 (R.I. 1995) (citing *State v. James*, 557 A.2d 471, 473 (R.I.1989)); *accord State v. Miller*, 679 A.2d 867, 872 (R.I.1996). "Because credibility determinations are solely a jury function, a witness is not permitted to offer an opinion concerning the truthfulness of the testimony of another witness." *Haslam*, 663 A.2d at 905 (citing *James*,

557 A.2d at 473). "Even when a witness does not literally state an opinion concerning the credibility of another witness but his or her testimony would have the same 'substantive import,' such testimony is inadmissible." *Id.* (citing *State v. Tavares,* 590 A.2d 867, 870–71 (R.I.1991)).

At trial, Dr. Ladd neither testified directly with respect to Sharon Mallard's credibility nor did he offer an opinion about her truthfulness. Thus, the salient question before us is whether his testimony that he "agreed in large part with the conclusions in [Mallard's] two reports" has the same "substantive import" as bolstering. After a review of the entire record, we conclude that it does not.

In our opinion, when viewed in context, the substantive import of Dr. Ladd's testimony was that, based on his review of the raw data, observations, and methodology in Sharon Mallard's report, he shared her opinion that defendant could not be excluded as a contributor to the DNA found underneath the victim's fingernail.[21] Doctor Ladd's testimony was that he was provided with Mallard's reports as well as the worksheets which contained the data and observations that formed the basis for her conclusions.[22] He testified clearly and unequivocally that that those materials were of the type relied upon by others in his profession, that he personally reviewed them, and that they were a sufficient basis for him to form an opinion. Ultimately, he testified that based upon his review of those materials, and within a reasonable degree of scientific certainty, he agreed to a substantial degree with Mallard's conclusions.[23] Although our rules of evidence favor testimony that relates percipient observations rather than opinions, there are circumstances when opinion testimony is admissible. *See generally* Rules 702, 703 and 704 of the Rhode Island Rules of Evidence. It is undisputed that Dr. Ladd's testimony reflected a degree of experience and specialized scientific knowledge that would assist the jurors to understand the evidence being presented to them. *See* Rule 702.[24] Moreover, we agree with the state that the trial justice properly allowed Dr. Ladd to reveal to the jury that the basis for his opinion was the objective scientific data and observations that were contained in Mallard's reports. *See* Rule 703.[25]

21. Mallard testified that although the DNA found under nail number five excluded 99.9993462% of the Caucasian population, the profile did not exclude defendant. Critically, Dr. Ladd testified that he did not believe the amended report affected the conclusion that defendant could not be excluded as the source of the DNA found underneath nail number five.

22. Those reports and worksheets already had been admitted into evidence as full exhibits along with the testimony of Mallard.

23. Notably, Dr. Ladd also expressed some reservations. He testified that Mallard's second report, which was written after an audit of the lab, "was the superior way to do it." In addition, he testified that he considered the 21 allele in number 5 of test 1.12 a "stutter product," and not an actual allele, as Mallard had concluded.

24. Rule 702 of the Rhode Island Rules of Evidence states:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

25. Rule 703 of the Rhode Island Rules of Evidence provides:

"An expert's opinion may be based on a hypothetical question, facts or data perceived by the expert at or before the hearing, or facts or data in evidence. If of a type reasonably and customarily relied upon by experts in the particular field in forming opinions upon the subject, the underlying facts or data shall be admissible

If read in isolation, one question asked of Dr. Ladd by the prosecutor may have been arguably close to the line separating a permissible opinion from bolstering.[26] However, consistent with our well-established precedent, we look to the totality of the witness's testimony. *See State v. Lyons*, 725 A.2d 271, 276 (R.I.1999) ("A reviewing court should not select one isolated statement in a witness's testimony without considering the testimony as a whole."); *see also State v. Rushlow*, 32 A.3d 892, 898, 900 (R.I.2011) (upholding trial justice's ruling to not pass a case despite witness' singular, bolstering statement that the victim of a sexual assault "appeared a little nervous, upset and sincere on the issue"). After having reviewed the entire record, we disagree with defendant's assertion that "the jury would perceive Ladd's testimony as stating a conclusive opinion on Mallard's credibility." In our view, the substance of his testimony was an opinion that was based on the objective scientific observations, facts, and figures contained in Mallard's reports.

The circumstances of this case resemble those before this Court in *State v. Arroyo*, 844 A.2d 163 (R.I.2004). In *Arroyo*, the state elicited testimony from two fingerprint experts. *Id.* at 166. The first expert testified that he had lifted latent fingerprints from the scene of a robbery, compared them with the known prints of the defendant, and determined that they matched. *Id.* After a cross-examination that focused heavily on the first expert's lack of experience, the state called a second fingerprint expert who had more than twenty-five years of experience in that field and who had testified in numerous trials. *See id.* at 169–70. The second expert testified that although he did not personally lift the prints from the crime scene, he examined the same latent fingerprints as had the first expert, and he came to the same conclusion; that the latent fingerprints found at the scene matched the known fingerprints of the defendant. *See id.* This Court held that the second expert's opinion, which was based on an independent analysis of objective facts, "neither directly nor indirectly touched on the credibility" of the first expert. *Id.* at 170. Therefore, we concluded that the testimony did not constitute bolstering. *See id.*

■ Similar to the second fingerprint expert in *Arroyo*, Dr. Ladd examined the data from Sharon Mallard's worksheets, which contained objective scientific data, and he came to his own conclusion. He then testified that the opinion he formed was consonant with the conclusions in her reports. Certainly, defendant raised a valid distinction at trial when he argued to the jury that Dr. Ladd (unlike the second expert in *Arroyo* ) did not perform his own independent analysis of the biological samples "from scratch" to form his opinion. In this sense, the foundation for Dr. Ladd's opinion was a step "removed" from the physical evidence. In our opinion, however, this is an argument that bears on the weight that the jury should assign to

without testimony from the primary source."

26. The defendant points to the following exchange between the prosecutor and Dr. Ladd:

"Q: I'm going to show you state's [exhibit] 110 again. Does that report include conclusions?

"A: Yes.

"Q: And did you review the conclusions?

"A: Yes.

"Q: Could you tell us what you found with respect to your review of the methodology, the reports and the conclusions that were made in that report, what did you find?

"A: I agree with these conclusions."

his opinion, and not on its admissibility.[27] Doctor Ladd's reliance on the objective measurements contained in Dr. Mallard's worksheets and reports distinguishes his testimony from the kind of "subjective analysis" that this Court has held constitutes bolstering. *See e.g., Rushlow,* 32 A.3d at 898–99; *Lassiter,* 836 A.2d at 1109 (holding that a police officer's testimony that he believed another witness was not being truthful was improper because it was "not based on any objectively measurable criteria, * * * but on his instincts and assumptions as an experienced officer"); *Tavares,* 590 A.2d at 870–71 (holding that a witness' testimony that the victim did not behave a like a person who had recently been raped was improper bolstering because it was based on a subjective opinion about the victim's credibility rather than personal observations). Therefore, we affirm the ruling of the trial justice.

## B. Defendant's Motions for Judgment of Acquittal and New Trial

■■■ The defendant also argues that the trial justice erred when he denied defendant's Rule 29[28] motion for judgment of acquittal and his motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure.[29] In advancing this argument, he maintains that there was insufficient evidence from which a juror could find him guilty beyond a reasonable doubt. "[P]revailing on an acquittal motion is a heavier burden for a defendant because the trial justice 'must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw[ing] therefrom all reasonable inferences consistent with guilt.'" *State v. Pineda,* 13 A.3d 623, 640 (R.I.2011) (quoting *State v. Cardin,* 987 A.2d 248, 250 (R.I.2010)). Conversely, the burden is less onerous under the standard applicable to a motion for new trial because the trial justice is permitted to weigh conflicting evidence. *See id.* "When faced with a defendant's challenge to the rulings on both motions, as here, this Court first conducts a review of the new-trial motion." *Id.* (citing *State v. Cardona,* 969 A.2d 667, 672 (R.I.2009)). The motion for a new trial requires a "more exacting analysis," *Cardona,* 969 A.2d at 672, therefore "unless a defendant can show that the presented evidence failed to support his or her conviction upon the motion-for-a-new-trial standard, a defendant necessarily will be unable to establish he or she was entitled to a judgment of acquittal." *Pineda,* 13 A.3d at 640.

■■■ When considering a defendant's motion for a new trial, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *St. Michel,* 37 A.3d at 102 (quoting *Cerda,* 957 A.2d at 385). "In

27. In fact, Dr. Ladd was cross examined about whether he could have, or should have, tested any biological material himself. During cross-examination, defense counsel asked Dr. Ladd if he had ever asked for a sample of the biological material found under the number five fingernail to run a test. Doctor Ladd responded that he was unsure of whether there was any other material left to test.

28. Rule 29(a)(1) of the Superior Court Rules of Criminal Procedure states, in relevant part: "The court on motion of a defendant or on its own motion shall order the entry of

judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, after the evidence on either side is closed, if the evidence is insufficient to sustain a conviction of such offense or offenses."

29. Under Rule 33 of the Superior Court Rules of Criminal Procedure, "[o]n motion of the defendant the court may grant a new trial to the defendant if required in the interest of justice."

performing his independent analysis, 'the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.' " *Id.* (quoting *Cerda,* 957 A.2d at 385). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." *Id.* (quoting *Cerda,* 957 A.2d at 385). "If, however, the trial justice finds that the state has failed to prove the defendant's guilt beyond a reasonable doubt, a new trial must be ordered." *Id.* (quoting *Cerda,* 957 A.2d at 385). "This Court will not overturn a trial justice's ruling on a motion for a new trial unless he was 'clearly wrong' or 'overlooked or misconceived material and relevant evidence that related to a critical issue in the case.' " *Id.* (quoting *Cerda,* 957 A.2d at 386).

■ ■ After a thorough review of the record, it is obvious to us that the trial justice performed a thorough and proper analysis with respect to defendant's motion for a new trial in this matter. The defendant contended that the trial justice should not have found the state's primary witnesses, Steve Trimarco and Sharon Mallard, to be credible. It is clear, however, that the trial justice considered the testimony of both witnesses and that he came to a different conclusion: He found that Trimarco's testimony was reasonably detailed and believable even if he was an "unsavory" character overall.

Furthermore, he found that Mallard was highly credentialed with respect to her education and experience, and that her testing, though subject to searching cross-examination, was nonetheless credible.

Addressing the defendant's argument that any of defendant's DNA that may have been found under Margaret's fingernails likely was the result of a casual transfer, the trial justice determined that the "casual transfer" explanation was "highly improbable," but that in any event it was an issue for the jury to determine. This Court is loath to overturn the credibility findings of a trial justice because "it is the trial justice who has the opportunity to observe the witnesses as they testify and therefore is in a better position to weigh the evidence and to pass upon the credibility of the witnesses than is this court." *Penhallow v. Penhallow,* 725 A.2d 896, 897 (R.I.1998) (mem.) (quoting *Lembo v. Lembo,* 677 A.2d 414, 417 (R.I.1996)). We see no reason to deviate from those principles here.

After a lengthy review of all the other testimony, the physical evidence, and the arguments of the parties, the trial justice came to the firm conclusion that "the circumstantial evidence in this case * * * amounted to overwhelming evidence that the defendant was the only person who would have had the knowledge, opportunity and access to the premises to perpetrate this crime" and that the DNA evidence was "the lynchpin that directly tied the defendant to this case." We conclude that there is no basis for disturbing that conclusion, and we affirm the trial justice's ruling on the defendant's motion for a new trial. Because we have affirmed the Superior Court with respect to this motion, we need not, and do not, reach a review of his Rule 29 motion for judgment of acquittal. *See Pineda,* 13 A.3d at 640.

## IV

### Conclusion

For the foregoing reasons, the defendant's judgments of conviction are af-

firmed. The papers in this matter are remanded to the Superior Court.

Justice INDEGLIA did not participate.

