March 12, 2024

**Supreme Court**

No. 2022-155-C.A.
(P2/20-1907AG)


State                          :

  v.                           :

Mark Chez.                     :


NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                        :

v.                                        :

Mark Chez.                              :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  The defendant, Mark Chez, appeals from

a November 28, 2022 judgment of conviction and commitment on one count of

carrying a pistol without a license in violation of G.L. 1956 § 11-47-8(a).  On

appeal, the defendant contends that the trial justice erred in denying his motion for

a judgment of acquittal and his motion for a new trial.

This case came before the Supreme Court for oral argument pursuant to an

order directing the parties to appear and show cause why the issues raised in this

appeal should not be summarily decided.  After considering the written and oral

submissions of the parties and after carefully reviewing the record, we are of the

opinion that cause has not been shown and that this case may be decided without

- 1 -

further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

## Facts and Travel

On July 10, 2020, Mr. Chez was charged by criminal information with one count of carrying a pistol without a license in violation of § 11-47-8(a). A jury trial took place over three days in October of 2021. We relate below the salient aspects of that trial.

## A

## The Testimony of Officer Daryl Pfeiffer

Daryl Pfeiffer, a police officer in Providence, Rhode Island, testified that at approximately 10:45 p.m., on May 30, 2020, he was in an unmarked police car with his partner, Officer Brian Murphy,[1] patrolling near the dead-end of Rhodes Street because "people hang out there and they smoke marijuana down there." He stated that Officer Murphy had turned the car around and had started in the opposite direction when Officer Pfeiffer observed a black SUV come to a stop "quite a bit a ways before a stop sign." Officer Pfeiffer testified that, because the situation seemed "kind of suspicious," the officers stopped their vehicle and waited; he added that, while they watched, the SUV reversed direction. He stated

---

[1] Officer Murphy had been promoted to the rank of sergeant in the Providence Police Department by the time he testified at the trial.

that the officers directed a fixed spotlight on the SUV, which was approximately thirty feet away. He testified that he immediately recognized defendant sitting in the passenger seat, and he added that he was aware that there were "several" outstanding arrest warrants for him.

Officer Pfeiffer stated that he and his partner started driving towards the SUV as it was backing up; he said that they closed the distance between the two vehicles to about ten to fifteen feet. He added that the SUV continued moving in reverse until it "[h]it a curb and they stopped," at which point defendant "immediately exited the vehicle * * * and took off running." He testified that defendant "was wearing a red hooded sweatshirt" and that his right arm was inside the pocket of his hoodie; he said that it looked as though defendant was holding an object in his pocket. Officer Pfeiffer further testified that he turned on his body camera and started running after defendant. He added that, when defendant was under the overpass[2] and "[a]bout fifteen feet" away from Officer Pfeiffer, defendant removed an object, which the officer said "appear[ed] to be a firearm," from his hoodie pocket and threw it "towards his left," onto "a concrete slope." He stated that, when defendant's "hand came out of his hoodie," he "could see the barrel of what appeared to be a firearm * * *." The officer testified that he knew

---

[2]     There are numerous references in the record of this case to an "overpass." It is clear to us from the record that that term is used to refer to the area where Public Street runs under Interstate 95.

beyond a reasonable doubt that the object which he saw defendant throw towards the concrete slope was a gun; he added that "[i]t sounded like metal hitting pavement * * * like, concrete/metal sound." He further testified that he yelled: "He just tossed a firearm" right after defendant threw the object that the officer believed to be a firearm.

Officer Pfeiffer stated that, after defendant threw the firearm, he continued to chase him while giving him "verbal commands." He added that, while chasing defendant across both Interstate 95 North and Interstate 95 South, he radioed other officers as to his own location and the location "where the suspect was running," as well as the location of the discarded firearm "under the overpass." Officer Pfeiffer testified that, because he temporarily became "caught up" on a fence, he lost sight of defendant; but he added that he thereafter saw "blue lights" and heard "the radio of backup officers" who had apprehended defendant. He said that he then returned to the overpass area where defendant had thrown the firearm. He stated that, at that location, he met Officer Murphy, Sergeant Johnathan Kantorski, and K-9 Officer Daniel Sirignano; he further stated that Officer Sirignano had already "secured the firearm" by putting it in a box. He added that it was after the firearm was secured that he was shown where it had been found. Officer Pfeiffer testified that defendant had been apprehended and the firearm had been found all within

"[a]pproximately eight minutes" from the beginning of his body camera footage, which was activated when he stepped out of the car to give chase.

**B**

**The Testimony of Officer Brian Murphy**

Officer Brian Murphy testified that, at approximately 10:45 p.m. on May 30, 2020, he was patrolling "the dead-end portion of Rhodes Street" with his partner, Officer Pfeiffer. He stated that, after reaching the dead-end, he turned the unmarked police car around to drive back up Rhodes Street when he saw "a black * * * SUV approaching" from the other direction. Officer Murphy testified that, as the police car approached the intersection of Rhodes Street and Eudora Street, the SUV "stopped short of the stop sign"—"approximately 25 to 30 feet" away from the police car—and "began reversing." He testified that he directed his spotlight towards the SUV, lit up its interior, and saw the "front two occupants" of the car. He added that he recognized defendant, whom he knew to be the subject of an outstanding arrest warrant.

Officer Murphy testified that, after recognizing defendant, he continued to follow the SUV "as it reversed before it came to a collision with the curb." He stated that, when the SUV came to rest at the curb, the police car was "[w]ithin maybe five feet" of the SUV, at which time the passenger door opened and defendant ran while "gripping a weighted object in his right * * * front pocket."

- 5 -

He said that the object seemed to him to be "weighted" because "the pocket was sagging down." Officer Murphy further testified that, as defendant fled, he "began to pursue him" on foot for "approximately * * * 15 feet." The officer added that he lost sight of both Officer Pfeiffer and defendant as they turned left onto Public Street. He testified that he then returned to the SUV in order to detain the driver. He also radioed dispatch and other officers, telling them that defendant "had fled on foot in the direction of the Big Blue Bug."[3] Officer Murphy further testified that, after backup officers arrived and relieved him from his detention duty at the SUV, he followed the route that Officer Pfeiffer had taken in pursuing defendant.

Officer Murphy also stated that, after Officer Pfeiffer broadcast that he had seen defendant "throw a firearm under the bridge," he relayed that information to Officer Daniel Sirignano, who "retrieved his K-9 and began canvassing the area," the result being that the dog "[r]ather quickly" located a firearm.

## C

### The Testimony of Officer Daniel Sirignano

Officer Daniel Sirignano, who was assigned to the K-9 unit, testified that he had worked for four years with "Jimbo," a police dog trained to search for firearms and objects with a "human scent" on them. He testified that, on May 30, 2020, at

---

[3] The "Big Blue Bug" is a very large, blue replica of a termite that is located near Interstate 95 in Providence. Visible from the highway, it serves as an advertisement for a pest control company.

approximately 10:45 p.m., he responded to a radio call and drove with the police dog to the Interstate 95 overpass on Public Street. He testified that, once he was there, Officer Murphy directed him to an area underneath the overpass where the "firearm was thrown, discarded." He further stated that he allowed the dog to search the area and that it located a firearm on the concrete slope of the embankment.

**D**

**The Testimony of Officer Edward Espinal**

Officer Edward Espinal testified that, on May 30, 2020, his shift and that of his partner, Officer Tavares, had just begun when, at approximately 10:45 p.m., he heard a radio broadcast from Officer Pfeiffer concerning "a foot pursuit." Officer Espinal testified that, as he and Officer Tavares were leaving the police station, they received an update to the effect that Officer Pfeiffer was "chasing a white male wearing a red hoodie," who had been running towards Interstate 95 North and then had "jumped into the south lane." He further testified that, while he was driving down the ramp onto Interstate 95, Officer Tavares exclaimed: "There he is." Officer Espinal testified that he "immediately slowed down" and "saw a male subject running from the highway back towards the Bay Street area" in the breakdown lane; he added that the suspect was wearing a "[r]ed hoodie." He testified that he pulled over in the breakdown lane and that Officer Tavares jumped

out of the vehicle to start pursuing the subject on foot. He added that he exited his police vehicle to follow Officer Tavares in pursuit of defendant and that, when he caught up, Officer Tavares already "had ahold of the suspect." Officer Espinal testified that he recognized the suspect in the red hoodie and knew his name, later identifying him at trial as defendant.

## E

### The Testimony of Sergeant Jonathan Kantorski

Sergeant Jonathan Kantorski, who had been serving in the Violent Crimes Task Force for approximately four years, testified that, on May 30, 2020, at approximately 11:00 p.m., he went to the Interstate 95 overpass at Public Street in response to "a broadcast from several of [his] officers that they were involved in a foot pursuit involving a firearm." He stated that, once there, he observed several patrol officers who directed him to the area under the overpass where the police dog had located the firearm. Sergeant Kantorski identified the firearm at trial. He testified that, on the night the firearm was recovered, he "took a picture of it as it lay," then "donned gloves" and "rendered it safe" by placing it in a box. He further testified that he delivered the firearm to Detective Carla Cavanagh at the "BCI Office in Central Station" and made the standard request for a test fire. Sergeant Kantorski testified that he did not request that the firearm be tested for fingerprints in view of his belief that "that's standard" and that he assumed it

- 8 -

would be done.  He further stated that he did not request DNA testing on the firearm since, "based on the totality of the circumstances, [he] didn't think it was necessary"—because of "the broadcast on the radio and body camera footage" and because "it was seen with an officer's own eyes."  When questioned at trial, he clarified as follows the facts and circumstances that prompted him not to request DNA testing of the firearm:

> "[PROSECUTOR]: What were those facts and circumstances?
>
> "* * *
>
> "[SERGEANT KANTORSKI]: The fact that they immediately recognized the suspect at the start, they broadcast an accurate description of what happened in that officer's eyes, what he said happened was backed up by what we found on the scene. And we apprehended the suspect at the time. It was the same suspect that they said it was on the radio before they apprehended him. Everything fell into place exactly as it was stated on the radio and to me as a supervisor arriving [on the scene]."

### F

### The Testimony of Detective Carla Cavanagh

Detective Carla Cavanagh, a detective in the Providence Bureau of Criminal Identification (BCI), testified that Sergeant Kantorski brought the firearm to her late in the evening of May 30, 2020, because it was BCI's responsibility to "collect the firearm, * * * photograph it, preserve it for any evidence that's requested, and then * * * send the weapon out for test fire."  When she was shown at trial the

- 9 -

photographs that she had taken of the firearm ("a 40-caliber Ruger SR4Oc"), she testified that there were some "imperfections" on the firearm—notably, some "scuffing," which she observed "[j]ust above the grip and on the tabs that lock the slide to the rear." Detective Cavanagh added that an imperfection could also be seen on the grip. She testified that she had swabbed the ammunition with cotton-tipped applicators and sent those out for DNA testing. She added, however, that because "[i]nsufficient human DNA was detected," no further testing was performed. She testified that such was often the result following this type of testing. She further stated that she was not requested to take pictures of the crime scene, to process the crime scene, or to take fingerprints of the weapon.

## G

### The Subsequent Travel of the Case

After the state rested, defendant moved for a judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. The trial justice denied that motion. On October 15, 2021, the final day of the trial, defendant rested; and, after preserving for the record certain previously made motions and arguments, again moved for a judgment of acquittal, which the trial justice denied. Later on that same day, defendant was found guilty by the jury.

On October 25, 2021, defendant filed a motion for a new trial pursuant to Rule 33, and a hearing on that motion was held on November 23, 2021; at the

conclusion of that hearing, the trial justice denied the motion. On January 19, 2022, defendant was sentenced to ten years, with two years to serve and eight years suspended, with probation. The defendant thereafter filed a timely appeal.

## II

## Analysis

When confronted, as is the case here, "with both Rule 29 and Rule 33 motions, this Court first conducts a review of the new-trial motion." *State v. Fleck*, 81 A.3d 1129, 1133 (R.I. 2014) (internal quotation marks omitted). It is our practice to proceed in that order due to the fact that, compared with the burden of proof that a Rule 29 motion entails, the burden of proof on a Rule 33 motion for new trial "is less onerous * * *." *State v. Richardson*, 47 A.3d 305, 317 (R.I. 2012). It follows that, if a defendant does not prevail on his or her motion for a new trial, that defendant "necessarily will be unable to establish [that] he or she was entitled to a judgment of acquittal." *State v. Pineda*, 13 A.3d 623, 640 (R.I. 2011).

## A

## The Motion for a New Trial

A Rule 33 motion for a new trial may be brought "on two bases: (1) insufficiency of the evidence and (2) weight of the evidence." *State v. McDonald*, 157 A.3d 1080, 1088 (R.I. 2017); *see also State v. Karngar*, 29 A.3d 1232, 1235

- 11 -

(R.I. 2011). Although the instant defendant does not do so with great clarity, he appears to have invoked both of the just-referenced bases for a new trial motion. Accordingly, we will address both the sufficiency of the evidence and the weight of the evidence arguments advanced by defendant. *See State v. Mensah*, 227 A.3d 474, 484 (R.I. 2020).

## 1. The Sufficiency of the Evidence

"A finding of legal insufficiency of the evidence is based on a conclusion that * * * the state failed as a matter of law to prove its case * * *." *State v. Perkins*, 460 A.2d 1245, 1247 (R.I. 1983). Therefore, "if a trial justice or this Court determines that an accused's motion for a new trial should have been granted because the state's evidence was insufficient to prove each element of the charged offense beyond a reasonable doubt, double jeopardy principles require the entry of a judgment of acquittal." *State v. Clark*, 974 A.2d 558, 570 (R.I. 2009); *see also Karngar*, 29 A.3d at 1235 ("If the trial justice determines that any rational trier of fact could have found that the prosecution established the elements of the crime beyond a reasonable doubt, then the motion must be denied; conversely, if the trial justice grants the motion, it is tantamount to a judgment of acquittal and retrial is barred by double jeopardy.").

The defendant contends that the trial evidence "left the jury with a case in which they could only guess or speculate" because "[t]he firearm was never

- 12 -

fingerprinted" or swabbed for DNA, "[n]or was any fiber analysis conducted." In addition, he asserts that "[p]hotographs of the scene were taken months after the * * * arrest." He further states that "[t]here was ambiguity as to whether it was pitch black, very black or very dark at the time of the foot pursuit;" he adds that "the body-camera footage shows that the distances were too far."

The state points out that the trial justice "considered and rejected defendant's arguments that the state's case was fatally flawed by the lack of DNA or fingerprint evidence, the lighting conditions, or the distances involved in the chase." The state emphasizes that the trial justice "rejected defendant's argument, as did the jury, that the lack of forensic evidence was more important than the credible testimony and footage of the pursuit by the officers involved." The state also points out that the trial justice found it unnecessary to discern whether it was "dark, very dark, or pitch black" outside because she noted that "ambient light was apparent from the videos."

When a trial justice reviews the sufficiency of the evidence pursuant to a new trial motion alleging insufficiency of the evidence, he or she "must examine the evidence in the light most favorable to the prosecution, without assessing the weight of the evidence or the credibility of the witnesses, and draw all reasonable inferences consistent with guilt, mindful that the jury likewise has done so." *Mensah*, 227 A.3d at 484 (quoting *Clark*, 974 A.2d at 570). The trial justice must

- 13 -

deny a new trial motion of this type if "any rational trier of fact could have found that the prosecution established the elements of the crime beyond a reasonable doubt * * *." *Karngar*, 29 A.3d at 1235. A guilty verdict will not be overturned "unless, viewing the evidence in the light most favorable to the prosecution, no reasonable jury could have rendered it." *Mensah*, 227 A.3d at 485 (quoting *Clark*, 974 A.2d at 571); *see also Karngar*, 29 A.3d at 1235. This Court's review of the trial justice's decision on such a motion for a new trial is *de novo*, and "we examine the evidence in the light most favorable to the verdict * * *." *Clark*, 974 A.2d at 571.

In the case at bar, the trial justice recounted defendant's arguments, namely "that there was no DNA, no fingerprints, and no fiber analysis conducted and * * * the photographs at the scene were taken in winter at a time when the foliage in and around the concrete slab where the firearm was located was significantly less" than it was on May 30, 2020. Considering these arguments, the trial justice observed that "defendant makes much of the lack of evidence in this case as a basis for granting a new trial." The trial justice summarized her impression of these arguments and then concluded: "The jury rejected these arguments and so does this [c]ourt."

The trial justice specifically rejected defendant's contention that insufficient lighting and the distance between Officer Pfeiffer and defendant prevented the

- 14 -

officer's observation of what was thrown. The trial justice found it particularly important that "the body-worn camera of Officer Pfeiffer reveals some degree of ambient lighting * * *." The trial justice also found it significant that the police dog "did not hit on any other item that had a human scent or the scent of [firearm] powder in the area of the concrete incline." She determined that Officer Pfeiffer's testimony was "unwavering" to the effect "that he saw the barrel of the gun that was being held by the defendant, * * * that [he] saw the defendant's motion of throwing the gun with his right hand to the left as he ran * * *, and that he heard the sound of metal hitting concrete immediately after he saw the defendant's throwing motion." The trial justice also found it important that "Officer Pfeiffer reiterated what he saw to the officers who had responded" and that he indicated to the other responding officers the location of the firearm. The trial justice concluded by stating:

> "The weight of the credible evidence support[ed] the jury's finding beyond a reasonable doubt that an operable firearm, to wit, a Ruger SR40c had been in the defendant's possession, that he did not have a license to carry that firearm outside his residence, that he discarded the firearm so as to distance himself from the contraband, and that he continued to flee from the police both before and after discarding that firearm."[4]

---

[4]      It is not entirely clear that the trial justice delineated the standards with precision. We are convinced that the trial justice's conclusion would remain unaltered, however, given that the burden of proof would be even heavier for defendant than that which was applied. Regardless, we need not grant deference to the trial justice's conclusion; our analysis is *de novo*.

After conducting our own thorough review of the evidence in the record, we are fully satisfied that it provided a basis upon which a rational juror "could have found that the prosecution established the elements of the crime beyond a reasonable doubt * * *." *Karngar*, 29 A.3d at 1235. The defendant was recognized by multiple officers and was observed running away from the police with a weighted object in the front pocket of his hoodie. Officer Pfeiffer testified that he observed defendant as he removed an object from his hoodie and threw it. He also observed that the object which was thrown had a firearm barrel. A firearm was discovered by the police dog in the same area where Officer Pfeiffer had yelled "He just tossed a firearm" upon observing defendant throw the weighted object that had been in the pocket of his hoodie. The firearm was also discovered where Officer Pfeiffer stated that he heard the sound of metal hitting concrete. The firearm that was discovered had markings indicating that it had been scratched.

After our *de novo* review, it is our opinion that the state presented more than sufficient evidence to support a reasonable inference of guilt beyond a reasonable doubt. Accordingly, it is our view that the trial justice did not err in denying defendant's motion for a new trial that was based on his contention that there was insufficient evidence to support the conviction.

## 2. The Weight of the Evidence

In addressing the weight of the evidence aspect of his motion for a new trial, defendant argues on appeal that "this is a case of credibility * * *." He contends that the trial justice should not have found Officer Pfeiffer's testimony to be credible. In support of this assertion, he contends that, "[i]n weighing the credibility of [Officer] Pfeiffer, the [c]ourt could and should have concluded that [Officer] Pfeiffer could not see what, if anything, was thrown." The state responds that "[t]he trial justice not only found Officer Pfeiffer credible, but she also found that his testimony was corroborated by both his body camera footage and the testimony and body camera footage of the other officers."

When reviewing a Rule 33 motion for a new trial based on the weight of the evidence, "the trial justice acts as a thirteenth juror, exercising independent judgment on the credibility of the witnesses and on the weight of the evidence." *State v. Heredia*, 10 A.3d 443, 446 (R.I. 2010) (internal quotation marks omitted); *see Fleck*, 81 A.3d at 1133. When the trial justice carries out the required steps relative to a Rule 33 motion based on the weight of the evidence, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Grantley*, 149 A.3d 124, 131 (R.I. 2016) (quoting

- 17 -

*State v. Matthews*, 111 A.3d 390, 398 (R.I. 2015)). If, after performing "that three-step analysis, the trial justice agrees with the jury's verdict or determines that reasonable minds could differ, then the analysis is complete and the verdict should be affirmed." *State v. Garrett*, 91 A.3d 793, 800 (R.I. 2014) (internal quotation marks omitted).

It is well established that we "will not overturn a trial justice's determination with regard to such a motion unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence relating to a critical issue in the case." *State v. Guerra*, 12 A.3d 759, 766 (R.I. 2011) (internal quotation marks and brackets omitted); *see also State v. Johnson*, 199 A.3d 1046, 1051 (R.I. 2019) ("If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong.") (quoting *State v. Gomez*, 116 A.3d 216, 223 (R.I. 2015)). This Court accords great deference to a trial justice's decision on a motion for new trial based on the weight of the evidence because "the trial justice is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *Johnson*, 199 A.3d at 1051 (deletion omitted) (quoting *Gomez*, 116 A.3d at 223).

After carefully reviewing the record, we perceive no error in the trial justice's determination that the testimony of the witnesses, particularly (but not exclusively) that of Officer Pfeiffer, was credible. At the hearing on the new trial motion, the trial justice properly set out the standard for deciding a Rule 33 motion challenging the weight of the evidence, and she accurately summarized the testimony elicited at trial. During her recitation of the facts, the trial justice elaborated on the corroborations of the testimony—including the body camera footage, during which "on at least two occasions" Officer Pfeiffer can be heard stating that he knew where defendant had tossed the firearm and "further describing the location." In addition, she specifically found "Officer Pfeiffer's description of how far away he was from the defendant during the foot pursuit * * * credible and sensible." In ruling on defendant's motion, the trial justice independently considered the credibility of the witnesses, characterizing the testimony offered by Officer Pfeiffer, Officer Murphy, and Officer Sirignano as being "credible." She emphasized that most of their testimony was "corroborated by their respective body-worn camera videos." Considering the evidence in light of the jury charge, the trial justice determined that she agreed with the verdict and that she would have reached the same result, stating: "In light of the charge to the jury * * * and considering the credible testimony offered * * * this [c]ourt would have reached the same result as the jury did * * *." The trial justice found the

- 19 -

testimony offered in court, "most notably, that of Officer Pfeiffer, * * * [Officer] Murphy, and [Officer] Sirignano," to be credible; and we can discern no reason to differ with that finding. For these reasons, it is our opinion that the trial justice properly determined that defendant's contentions were unpersuasive. In doing so, the trial justice did not misconceive or overlook evidence related to a critical issue, nor did she clearly err when she denied defendant's motion for a new trial.

**B**

**The Motion for a Judgment of Acquittal**

In light of the fact that the defendant has not prevailed on his motion for a new trial, he is necessarily unable to establish that he is entitled to a judgment of acquittal pursuant to Rule 29. *See Richardson*, 47 A.3d at 317.

**III**

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record in this case may be returned to that tribunal.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Mark Chez. |
| **Case Number** | No. 2022-155-C.A. (P2/20-1907AG) |
| **Date Opinion Filed** | March 12, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Kristin E. Rodgers |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia McGinn<br>Department of Attorney General |
| | For Defendant:<br><br>Michael S. Pezzullo, Esq. |