**STATE**

v.

**Carlos ARROYO.**

No. 2003–2–C.A.

Supreme Court of Rhode Island.

March 26, 2004.

Jane M. McSoley, Esq., for Plaintiff.

Catherine A. Gibran, Esq., for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

PER CURIAM.

The defendant, Carlos Arroyo, appeals from the judgment of a Superior Court jury convicting him of first-degree robbery. This Court heard oral arguments on January 27, 2004, pursuant to an order directing all parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After considering the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown and, therefore, we proceed to decide this case at this time. For the reasons stated below, we affirm the conviction.

Shortly before 10 p.m. on January 10, 2001, a man and a woman entered the China House Restaurant in Providence as Kevin Lam and his fellow employees were

preparing to close for the evening.[1] Lam, who had been working the counter that evening, took the couple's takeout order. After their order had been placed, the couple went to a beverage cooler, from which the woman took a can of soda and the man a carton of orange juice.[2] The man returned to the counter while the woman, soda in hand, left the restaurant. Placing the orange juice carton on the counter, the man asked Lam whether it was for sale. The record is unclear as to Lam's response, but the man, in any event, left the restaurant without the orange juice, which remained on the counter.

Ten minutes later, the same man returned—alone—and asked to be "rung out." Lam testified that while he was calculating the couple's bill, the man pulled out a gun and ordered him not to move. The man then went behind the counter and attempted to open the cash register. Unable to do so, he demanded that Lam open it for him. Lam complied. After the register was opened, the man, with his finger on the trigger, cocked the gun, once more ordered Lam not to move, and proceeded to take $500 to $600 from the register before walking from the restaurant. Although the holdup man absconded with the cash, he left the carton of orange juice on the counter.

Lam immediately telephoned 9–1–1. He told the responding officers that the perpetrator had been wearing a light-green jacket with a hood. Lam testified that the gun the robber had pointed at him was black, six inches long, and that its handle was wrapped with a dark-blue bandana. He also testified that he had been concerned for his well-being during the robbery, fearing his son might never see him again.

Robert Firth, a detective from the Bureau of Criminal Investigation of the Providence Police Department (BCI), was dispatched to process the crime scene. According to his testimony, he was able to "lift" several latent fingerprints from both the orange juice carton left on the counter and the used carton in the cooler. Using the Automated Fingerprint Identification System (AFIS), Det. Firth conducted a computer search to find a match for these latent prints. AFIS generated a group of potential matches. He then narrowed this group and matched the latent prints to a set of inked prints on file belonging to defendant. In accordance with BCI practice, Det. Firth then submitted his findings to two other BCI fingerprint examiners as a "safeguard," asking them to offer their respective opinions. Their separate findings did nothing to change Det. Firth's own opinion that the latent prints matched defendant's prints.

Robert Clements, the lead detective investigating the robbery, was then provided with defendant's name. He obtained an arrest warrant and executed it at defendant's apartment, which was about a four-

1. Lam testified that he was alone behind the counter at the front of the restaurant and that three other employees were in the kitchen. These employees apparently were not aware of the events that transpired in the front part of the restaurant.

2. Apparently, there were two orange juice cartons in the cooler at the time the couple entered the restaurant. Lam testified that these cartons had been purchased about a week before the robbery as a package of two, wrapped together in clear plastic, and had been placed in the cooler as purchased. At some point before the robbery, one of the cartons somehow had been used, so that the other carton remained only "half wrapped." At trial, after being shown photographs of the cooler taken immediately after the robbery, Lam testified that the clear plastic wrapper that had been around the full carton before the robbery was displaced and resting on the bottom shelf.

minute walk from the restaurant. In the process of executing that warrant and taking defendant into custody, the police seized a blue bandana and a hoodless, dark-green fleece jacket. No gun, however, was ever seized in connection with the robbery. While in custody, and after being properly advised of his rights, defendant claimed that he had never been in the China House Restaurant.

On June 28, 2001, a grand jury returned an indictment charging defendant on four separate counts: first-degree robbery, in violation of G.L.1956 § 11–39–1(a); possessing a firearm after being convicted of a crime of violence, in violation of G.L.1956 § 11–47–5; using a firearm when committing a crime of violence, in violation of § 11–47–3.2(a); and carrying a firearm without a license, in violation of § 11–47–8(a). A jury trial was conducted between February 18 and 21, 2002, at the end of which the jury returned a verdict convicting defendant of first-degree robbery, but acquitting him on all three firearms counts. On March 5, 2002, defendant moved for a new trial. On March 25, 2002, the trial justice issued a written decision denying defendant's motion. On May 29, 2002, the trial justice sentenced defendant to serve twenty-five years, with ten years suspended.[3] The defendant filed an appeal of his conviction that same day, raising several issues that we address below.

### Expert Testimony

■ The defendant first argues that the trial justice abused his discretion in qualifying Det. Firth as an expert witness because his experience and training in fingerprint comparison and identification were insufficient. Therefore, defendant contends, the trial justice improperly allowed Det. Firth to offer an expert opinion with respect to the fingerprint evidence. The state responds that the trial justice did not abuse his discretion in qualifying Det. Firth as an expert, and that any claimed shortcomings in Det. Firth's experience should have an impact only on the weight accorded his testimony and not the admissibility of his opinion.

■ Rule 702 of the Rhode Island Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion." Qualifying a witness as an expert on a particular subject rests solely with the discretion of the trial justice, and this Court will not disturb such a finding absent a showing of abuse of discretion. *State v. Rodriguez*, 798 A.2d 435, 438 (R.I.2002) (per curiam) (citing *State v. Collins*, 679 A.2d 862, 867 (R.I. 1996)). "An individual need not hold a particular license, title or certificate in a specialized field to testify as an expert; he or she need only possess 'knowledge, skill, experience, training, or education' [that] can deliver a helpful opinion to the factfinder." *Mills v. State Sales, Inc.*, 824 A.2d 461, 470 (R.I.2003) (per curiam) (quoting *Raimbeault v. Takeuchi Manufacturing, (U.S.), Ltd.*, 772 A.2d 1056, 1061 (R.I.2001) and *Owens v. Payless Cashways, Inc.*, 670 A.2d 1240, 1244 (R.I.1996)). When assessing the probative value of expert-opinion testimony, "the jury is always free to accept, to reject, or to accord any

---

**3.** The trial justice also ordered defendant to serve a consecutive ten-year sentence as a habitual offender. However, defendant filed a *pro se* motion for correction of sentence to vacate the habitual offender portion of his

sentence, arguing that he did not receive the required notice. On October 23, 2002, the trial justice granted the defendant's motion and, accordingly, the ten-year habitual offender sentence was vacated.

amount of weight it chooses to that expert's testimony." *State v. Bertram*, 591 A.2d 14, 25 (R.I.1991) (citing *State v. Vargus*, 118 R.I. 113, 127, 373 A.2d 150, 157 (1977)).

At the time of trial, Det. Firth had been a Providence police officer for nearly eight years, and had been assigned to BCI for one year and eleven months. He testified that he had the following qualifications: approximately forty hours of training from a BCI lieutenant on classifying fingerprints and latent fingerprint identification; in-house training from other senior fingerprint examiners in the department; "in-house certification" after approximately sixty days at BCI; a two-semester course at the state crime lab at URI; and passing the final exam in April 2001 to qualify as a fingerprint examiner. As part of graduating from the URI crime lab course in April 2001 he was certified as a fingerprint examiner. He had compared latent prints to inked prints just under one hundred times, and he had compared inked prints more than one thousand times. Although the number of times is not clear from the record, Det. Firth testified that he had been qualified to testify as a fingerprint examiner in Superior Court before. On cross-examination, Det. Firth conceded that he has neither lectured on fingerprint examination nor published any articles relating to the subject. He admitted that he had received his certification from the URI crime lab three months after comparing the latent prints in the present case with the inked prints on file for defendant.

Detective Firth's knowledge, training, and experience, combined with his processing of the crime scene, are a sufficient basis on which to qualify him as an expert witness on the latent and inked fingerprints that are the subject of this case. It is true that the witness' certification from the URI crime lab was not conferred upon him until three months after he examined the fingerprints at issue in this case. But to testify as an expert, he was not required to be certified as a fingerprint examiner; what was required was that he possess knowledge, skill, experience, training, or education to deliver an opinion helpful to the jury. *See Rodriguez*, 798 A.2d at 438 (qualifying a former police officer who had failed a certification test as an expert in fingerprint examination); *see also Marshall v. Medical Associates of Rhode Island, Inc.*, 677 A.2d 425, 426–27 (R.I.1996) (per curiam) (qualifying as an expert in a case involving an animal bite wound a physician who was not board certified in emergency and internal medicine because he had encountered hundreds of similar wounds and had lectured on animal bites).

Although his qualifications were somewhat limited, Det. Firth nonetheless had a degree of knowledge and experience in fingerprint examination. The defendant was allowed to probe as to the extent of Det. Firth's experience and elicited an admission that at the time of the crime he had not been certified in fingerprint examination, other than an "in-house certification" through BCI's own process. We conclude, however, that these considerations, to whatever degree they might detract from a positive view of Det. Firth's overall ability to testify as an expert, affect only the weight and not the admissibility of his testimony.

The trial justice qualified Det. Firth as an expert, advising the jurors that merely because a witness is qualified as an expert, they need not "automatically believe the opinion of an expert, be it this gentleman or any person qualified as an expert; that's for you to decide as relates to the experience and whatever information is brought to your attention throughout the entire course of the trial." On cross-examination, defendant took the opportunity to

question and raise doubts about the extent of Det. Firth's experience and the basis of his ultimate opinion. The trial justice further instructed the jurors at the close of evidence that they should "consider any expert testimony and give it such weight as you think it deserves," including "disregard[ing] the opinion entirely." Thus, the trial justice instructed the jury to weigh that testimony and either accept or reject it. The jurors were correctly instructed and capable of independently evaluating Det. Firth's testimony and arriving at their own independent conclusions about the probative value of that testimony. Therefore, we hold that the trial justice did not err in qualifying Det. Firth as an expert and allowing him to offer his opinion regarding the fingerprint evidence.

### Bolstering of Detective's Fingerprint Assessment

The defendant next argues that the trial justice erroneously permitted the state to bolster Det. Firth's fingerprint assessment when he allowed the state to ask whether Det. Firth's conversation with two other fingerprint examiners made him change his own opinion, thereby avoiding a hearsay challenge. The defendant submits that the trial justice further erred in permitting the state to bolster its case through the presentation of retired Major John Power, who testified to thirty-eight years of experience in fingerprint identification. The defendant further contends that Major Power's testimony on that issue was prejudicially cumulative.

The state counters that defendant has waived the issue of bolstering with respect to the reference to the two other fingerprint examiners because defendant failed to object when the prosecutor asked whether Det. Firth had changed his opinion after consulting with them. Therefore, the state contends that defendant's claim of error regarding bolstering through the

use of the other examiners' findings has been waived. The state also argues that the findings of Major Power were admissible and did not constitute improper bolstering because defense counsel, during cross-examination, had questioned Det. Firth's qualifications and ability to render an expert opinion.

■ Impermissible "bolstering" or "vouching" typically occurs when one witness "offer[s] an opinion regarding the truthfulness or accuracy of another witness' testimony." *State v. Lassiter*, 836 A.2d 1096, 1107 (R.I.2003) (quoting *State v. Webber*, 716 A.2d 738, 742 (R.I.1998)). Bolstering is forbidden because "[t]he determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury." *Id.* (quoting *Webber*, 716 A.2d at 742). "Impermissible bolstering may occur even if the witness does not literally state an opinion concerning the credibility of another witness's testimony." *Id.* (citing *Webber*, 716 A.2d at 742). "If one witness's testimony has the same 'substantive import' as if it addressed another witness's credibility, it is inadmissible." *Id.* (quoting *Webber*, 716 A.2d at 742).

■ We conclude that neither Det. Firth's testimony concerning his consultation with the two detectives nor Major Power's testimony constitute improper bolstering. First, with respect to the state's raise or waive argument, we note that the trial justice overruled defendant's objection to a question directed at Det. Firth intended to elicit testimony as to whether the latent fingerprints taken from the crime scene matched the inked fingerprints of defendant. In doing so, the trial justice, noting that the record was preserved, stated at sidebar that "the defendant has a continuing objection to any opinion being offered by this witness as to

the fact of his examination, his opinion that the examination shows that the prints found at the scene match those of the defendant." The question at issue here, posed by the state on redirect, was whether Det. Firth had "change[d][his] opinion as to whether those five latent prints belonged to the defendant" after he consulted with two other detectives. Clearly, the elicited opinion was still that of Det. Firth and not the other two detectives. The record was preserved and the continuing objection ran to this opinion testimony on redirect examination. Therefore, the state's raise or waive argument fails.

■ Nonetheless, the trial justice did not err by allowing the state to question Det. Firth about his consultation with the two detectives. These detectives did not testify and therefore could not speak to Det. Firth's credibility or to his opinion. By asking the detectives to review the fingerprint evidence, Det. Firth was following a BCI practice, about which he testified, of double-checking one's own work.

■ With respect to Major Power's testimony, Major Power neither testified as to Det. Firth's credibility nor "offer[ed] an opinion concerning the truthfulness of [his] testimony." *State v. Marr*, 731 A.2d 690, 695 (R.I.1999) (quoting *State v. Lyons*, 725 A.2d 271, 276 (R.I.1999)). Furthermore, Major Power testified about his own extensive qualifications as a retired police officer with thirty-eight years experience, twenty-five of which were served as a BCI detective, including being qualified as an expert in courts "[w]ell over a hundred" times. Major Power's opinion, that the latent fingerprints taken from the crime scene matched the inked prints of defendant, did not bolster Det. Firth's opinion. Although Major Power was not at the crime scene, he conducted an independent examination and found that the latent prints were identical to the inked fingerprints of defendant. Major Power's testimony neither directly nor indirectly touched on the credibility of Det. Firth. He merely offered an opinion after an independent evaluation of the fingerprint evidence. Major Power's testimony was likely sought, as the trial justice noted during a sidebar conference, because Det. Firth's qualifications and experience were called into question during cross-examination. The trial justice, therefore, did not err in permitting Major Power to offer his expert opinion.

### Inconsistent Jury Verdict

■ The defendant also argues that his conviction on the first-degree robbery count is both logically and legally inconsistent with his acquittal on all of the firearms counts. He maintains that the jury obviously was not persuaded that the perpetrator was armed with a firearm, and therefore a critical element of the proof of first-degree robbery is absent. The state argues, on the other hand, that although defendant was acquitted of all of the gun charges, possession or use of a gun is not an element of first-degree robbery. The state maintains that because possession or use of a firearm is not an element of the crime of first-degree robbery for which defendant was convicted, the verdicts are not legally inconsistent.

■ Whenever a verdict has been challenged as inconsistent because of different outcomes for different counts in the indictment or information, this Court has consistently followed the rule expressed in *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932). *See, e.g.*, *State v. Ramirez*, 786 A.2d 368, 373 (R.I. 2001); *State v. Verrecchia*, 766 A.2d 377, 387 (R.I.2001); *State v. Allessio*, 762 A.2d 1190, 1191 (R.I.2000) (per curiam). In *Dunn*, 284 U.S. at 393, 52 S.Ct. 189 Justice

Holmes observed that "[c]onsistency in the verdict is not necessary" because "[e]ach count in an indictment is regarded as if it was a separate indictment." Recognizing that "a jury must be afforded broad power to arrive at inconsistent verdicts of acquittal and conviction through its traditional power to compromise," this Court will uphold logically inconsistent jury verdicts provided that the verdicts are legally consistent. *State v. Romano*, 456 A.2d 746, 764 (R.I.1983).

 In defining legally inconsistent verdicts, we have in the past noted that if "the essential elements of the count[s] of which the defendant is acquitted are identical and necessary to prove the count of which the defendant is convicted," then the verdicts are inconsistent. *Allessio*, 762 A.2d at 1192 (quoting *State v. Jette*, 569 A.2d 438, 441 (R.I.1990), in turn quoting *State v. Mercado*, 263 S.C. 304, 210 S.E.2d 459, 460 (1974)). Even more helpful is the definition adopted by the Illinois Supreme Court: "[v]erdicts of guilty of crime A but not guilty of crime B, where both crimes arise out of the same set of facts, are legally inconsistent when they necessarily involve the conclusion that the same essential element or elements of each crime were found both to exist and not to exist." *People v. Frias*, 99 Ill.2d 193, 75 Ill.Dec. 674, 457 N.E.2d 1233, 1235 (1983) (quoting *People v. Murray*, 34 Ill.App.3d 521, 340 N.E.2d 186 (1975)). Logically inconsistent verdicts, on the other hand, have been defined as verdicts that "acquit and convict a defendant of crimes composed of different elements, but arising out of the same set of facts." *People v. Rhoden*, 299 Ill. App.3d 951, 234 Ill.Dec. 43, 702 N.E.2d 209, 213 (1998) (quoting *People v. Klingenberg*, 172 Ill.2d 270, 216 Ill.Dec. 813, 665 N.E.2d 1370, 1373 (1996)).

Section 11–39–1(a) provides that "[e]very person who shall commit: (1) robbery by use of a dangerous weapon; (2) robbery where a victim is injured; or (3) robbery where the victim is a person who is severely impaired or an elderly person; shall be guilty of first degree robbery * * * *." Although the statute does not set forth the elements of the crime of robbery, this Court has held that the common-law definition of "the felonious taking of money or goods of any value from the person of another, *or in his presence*, against his will, by violence, or putting him in fear" is applicable. *State v. Rodriquez*, 731 A.2d 726, 729 (R.I.1999) (per curiam) (quoting *State v. Shepard*, 726 A.2d 1138, 1140 (R.I. 1999)). Clearly, the possession or use of a firearm is neither an essential element of common-law robbery nor of the statutory offense of first-degree robbery. The elements of the separate firearms counts against defendant are not necessary to prove the first-degree robbery count, and vice versa. We reach this conclusion foremost because an essential element of first-degree robbery is the "use of a dangerous weapon," which can be a number of implements capable of causing serious harm, and not necessarily a firearm.

The jury's acquittal of defendant on all the firearms counts does not necessarily preclude its concurrent finding of guilt on the first-degree robbery count. Here, the jury may have found that the elements of possessing and using a firearm *did not* exist. However, the jury did find that the elements of first-degree robbery where present. The existence of a firearm is not an element of first-degree robbery. First-degree robbery and the firearms counts against defendant are separate and distinct crimes that can stand alone. Therefore, the verdicts are legally consistent. *See Romano*, 456 A.2d at 764 (holding that two contrary verdicts on "separate and distinct" crimes are legally consistent).

At trial, the state did not introduce a gun into evidence; indeed, no gun was ever recovered. Notwithstanding this lack of physical evidence, and the absence of evidence of any other dangerous weapon, defendant's conviction on the first-degree robbery count should stand. *See State v. Andrade*, 657 A.2d 538, 543 (R.I. 1995) (affirming a conviction of assault with a dangerous weapon and first-degree robbery, despite the state's failure to produce a weapon at trial). In *Andrade*, we stated on the facts of the case that "[a]lthough the state did not introduce the weapon into evidence, the jury could nevertheless infer that defendant had wielded an operative pistol on the basis of his actions and statements." *Id.* In affirming the first-degree robbery conviction in that case, we noted that the two victims of two separate crimes perpetrated by the same defendant both testified that they were frightened, that the defendant had aimed a gun at them during the crime, and that before leaving, the defendant once again aimed the gun at them and told one of them "not to call the police" and the other one "not to move but to 'give me five minutes.'" *Id.*

In the instant case, we note the following testimonial evidence: the robber aimed a gun at Lam; the robber twice told Lam not to move; the robber at one point cocked the barrel of the gun while his finger was on the trigger and put Lam in fear for his life. Despite the absence of a dangerous weapon at trial, the jury could have inferred from these facts that defendant used a dangerous weapon. While charging the jury on first-degree robbery, the trial justice correctly instructed that "a dangerous weapon includes any item or instrument * * * [that] by the manner in which it may be used, or employed, is likely to injure seriously another person" and that "[a] gun is presumed to be a dangerous weapon," whether it is loaded or not. *See State v. Jackson*, 752 A.2d 5, 9–10 (R.I.2000) (adopting the rule that an unloaded but operable gun will be presumed to possess a *per se* present ability to carry out the offer to do bodily injury to another). From the overall context of the robber's actions and statements, we hold that the jury may have inferred that defendant aimed a gun at Lam and that he was capable of carrying out the threat implicit in his terrifying actions and statements.

While we find that the verdicts are legally consistent, we recognize that they may not be logically consistent, inasmuch as defendant has been acquitted and convicted of crimes composed of different elements but arising out of the same set of facts. However, we will neither engage in speculation as to what the jury might have thought nor invade in any way the province of the jury and its traditional power to reach compromise verdicts. The verdicts are legally consistent and, therefore, defendant's conviction stands.

## Motion For a New Trial

Finally, defendant argues that the trial justice erred in denying his motion for a new trial because the jury's verdict of first-degree robbery was against the fair preponderance of the evidence and failed to do substantial justice. The state counters that the trial justice performed the requisite analysis and that the denial of the motion should not be disturbed.

"When considering a defendant's motion for a new trial, pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, a trial justice is required to review all the trial evidence and to exercise his [or her] own independent judgment upon that evidence to determine whether it was sufficient to have enabled the jury to conclude the guilt of the defen-

dant by proof beyond a reasonable doubt." *Ramirez,* 786 A.2d at 372 (quoting *State v. Barrett,* 768 A.2d 929, 945–46 (R.I.2001)). "In exercising his or her independent judgment, the trial justice must pass upon the weight and the credibility of each of the trial witnesses, and in that regard is permitted to accept or reject the testimony offered by those trial witnesses." *Id.* (quoting *Barrett,* 768 A.2d at 946).

 "When the trial justice has articulated a sufficient rationale for his or her decision to deny a defendant's motion for a new trial, that decision will be given great weight." *Ramirez,* 786 A.2d at 372–73 (quoting *Barrett,* 768 A.2d at 946). "This Court will not undertake to second-guess a trial justice's independent evaluation of the trial evidence unless we are able to discern from the record that in doing so, he or she has overlooked or misconceived material evidence relating to a critical trial issue, or if the justice was otherwise clearly wrong." *Id.* at 373 (quoting *Barrett,* 768 A.2d at 946). "Even were we to conclude that the trial evidence and the reasonable inferences drawn therefrom were so evenly balanced, or were such that reasonable minds could have arrived at a different conclusion with respect to that evidence, we would still not disturb the trial justice's decision denying the motion for a new trial." *Id.* (quoting *Barrett,* 768 A.2d at 946). "Furthermore, a trial justice, in articulating the rationale for his or her decision to deny a motion for a new trial, need not specifically refer to each speck of trial evidence that might support his or her decision, but need only relate to that evidence, which is sufficient to allow this Court to determine whether the trial justice has undertaken to comply with the applicable standards for his or her decision." *Id.* (quoting *Barrett,* 768 A.2d at 946).

The trial justice in the present matter rendered a written decision on defendant's motion for a new trial, in which he referred at the outset to the appropriate standard. He then reviewed the testimony of the critical witnesses, commenting on their credibility and the weight of the evidence. The trial justice observed that Lam "establish[ed] the elements of the crime of robbery" and that Lam was "a competent and credible witness about the commission of a robbery." The trial justice further observed that Lam was a competent witness with respect to the holdup man's placement of the orange juice carton on the counter and that the expert witnesses, Det. Firth and Major Power, determined that the fingerprints taken from the carton were those of defendant, who had said while in custody that he had never been in the restaurant. This Court finds that the trial justice articulated a sufficient rationale for his decision to deny defendant's motion.

Although the trial justice did not comment on all the evidence, he was not required to do so. We are satisfied that the trial justice has complied with the applicable standard of review. Our own review of the record demonstrates that the evidence adduced at trial supports the jury's verdict convicting the defendant of first-degree robbery. The trial justice neither overlooked nor misconceived material evidence, nor was he otherwise clearly wrong. Accordingly, we defer to the trial justice's decision and affirm the denial of the defendant's motion for a new trial.

## Conclusion

For the reasons stated above, we affirm the defendant's conviction for first-degree robbery. The papers in this case are remanded to the Superior Court.