**Supreme Court**

No. 2011-193-C.A.
(P1/07-2606A)

|  |  |
|---|---|
| State | : |
| v. | : |
| Marcus Huffman. | : |

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Marcus Huffman. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Marcus Huffman, appeals from a judgment of conviction following a lengthy trial, at the conclusion of which the jury found him guilty of first degree sexual assault stemming from an incident that occurred in March of 2007. The justice of the Superior Court who had presided over the trial sentenced the defendant to sixty years, with forty years to serve at the Adult Correctional Institutions and with twenty years suspended with probation.  For the reasons set forth in this opinion, we affirm the judgment of conviction.

# I

## Facts and Travel

### A

### The Incident of March 17–18, 2007[1]

Based upon the testimony and other evidence presented at trial, the jury reasonably could have found the following facts. On the afternoon of March 17, 2007, the nineteen-year-old complaining witness, whom we shall refer to pseudonymously as Cindy, was at her apartment in Fall River, Massachusetts, with her girlfriend and Cindy's sister; they spent some time smoking marijuana. At some point, Cindy's friend, Ryan Borges, arrived at the apartment; she left with him to pick up another friend, and they then went to Ryan's house. At approximately 8:30 p.m., Cindy's brother, Tyrone, arrived at Ryan's house, where Cindy, Ryan, and three other persons were already present. While at Ryan's house, Cindy drank alcohol (Red Bull mixed with liquor, and three shots each of vodka, rum, and cognac), and she shared four "blunts."[2] Cindy changed into a white "muscle shirt," a white long-sleeved T-shirt, a red shirt, jeans, a fitted hat, and sneakers. They then decided to go to a club in Providence called Platforms. Cindy testified that, before leaving Ryan's house, she felt "woozey." Tyrone considered Cindy to have been "drunk" while still at Ryan's apartment; he noticed that she was stumbling and that her eyes were "red," "watery," and "glazy." Tyrone testified that, once they arrived at the club, Cindy was "stumbling" and "slurring her words."

---

[1]    The facts contained within Part I A of this opinion are derived from the testimony of various witnesses and from several of the numerous exhibits; the jurors heard testimony for approximately fifteen days, and some twenty witnesses testified.

[2]    Cindy described the "blunts," which are referred to in the text, as cigars that had been cut open and filled with marijuana. See also In re Destiney L., 21 A.3d 279, 281 n.5 (R.I. 2011) ("'Blunt' is a slang term for a hollowed out cigar filled with marijuana." (internal quotation marks omitted)).

At some point near midnight, the group arrived at the entrance to Platforms. However, Cindy was not permitted to enter the club because (according to the owner of the nightclub and the owner of the security company that staffed the nightclub) she was too intoxicated. The rest of the group went into the club for approximately forty-five minutes. Cindy's companions had instructed her to wait for them in Ryan's car in the parking lot. However, Cindy chose not to wait in Ryan's car; she instead remained outside the club, near the entrance. While there, she noticed a police cruiser, the driver of which was speaking to the club's owner, Joseph Manfredi. Mr. Manfredi, who at trial identified defendant as that driver, saw Cindy walk over to defendant's cruiser.

The police officer, whom Cindy identified in court as defendant, had called her over to the window of the cruiser and told her that she had to leave the club's property due to her intoxication. When she told him that she did not have anywhere to go, the police officer told her to enter the front seat of the cruiser. Cindy proceeded to get into the cruiser because she "trusted him."

Cindy told defendant that she needed to use a restroom; defendant then drove her to what she described as a "brick" building, which building was later identified as being a police substation. Key card logs were used to monitor entries to the police substation, and monitoring was also conducted by surveillance cameras. Both the key card log and the surveillance footage indicated that defendant and Cindy entered the building at approximately 12:40 a.m. on March 18.

Cindy testified that, after entering the bathroom stall, her next memory was of waking up on the floor of the building—without her sports bra or boxer shorts on. She added that her pants were unbuckled and the zipper was pulled down. Cindy testified that she had felt pain in her

- 3 -

vagina, both inside and outside, and also in her back, her arms, and her thighs. Cindy said that her vagina felt swollen and that she "just knew something was wrong"; she added that she felt as though she were "leaking." She managed to leave the building on foot and to find her way to her aunt's house, which was not far away.

Cindy remembered nothing that happened between the time of her arrival at her aunt's house and the moment when she woke up in the hospital. According to her aunt, Josephine Saygbe, Cindy told her that she had been "raped by a cop." Her aunt called the police. The defendant was one of three patrolmen who responded to the aunt's home. The other two patrolmen noticed that, at the aunt's house, Cindy was very upset and appeared intoxicated. An EMT from the Providence Fire Department also responded to the aunt's house; the EMT examined Cindy and then transported her to Women and Infants Hospital. The defendant also went to that hospital, as did the other two patrolmen who had responded to the aunt's home.

Upon Cindy's arrival at Women and Infants Hospital, the physicians there determined that she was too intoxicated for them to perform a sexual assault kit at that time. Cindy stated that, when she used a bathroom in the hospital, she noticed bright red blood; she added that the blood was not the same color as that associated with her menstrual period, which had begun earlier that day. Cindy was transferred to Rhode Island Hospital, where blood tests were conducted. She tested positive for marijuana and she had a blood alcohol level of 0.174 at 4:28 a.m. on March 18. In due course, a sexual assault kit was performed at Rhode Island Hospital. There was divergent testimony at trial regarding the examination of Cindy: as we shall explain, the testimony of the resident who performed the sexual assault kit, of the certified nursing assistant (CNA) who assisted him, and of a sexual assault expert differed in several respects.

- 4 -

Doctor Keith Corl, a first-year resident, performed the Sexual Assault Evidence Collection kit and completed a report. He noted that Cindy complained of vaginal pain. He testified that he did not observe any trauma to the vagina. He further testified that he observed blood coming from Cindy's "cervical os," which he said was consistent with menstruation. He did not observe symptoms consistent with penetration; therefore, based upon the sexual assault kit results, he could not testify that vaginal penetration had occurred shortly prior to his examination of Cindy. It should be noted that it is undisputed that, years prior, Cindy had had sexual intercourse with a boyfriend.

Patricia Cragg, a certified nursing assistant, also testified at trial. She testified that she acted as the "chaperone" for Dr. Corl while he completed the sexual assault kit; she did not conduct any tests or otherwise examine Cindy. She handed the doctor the proper materials (such as swabs and tests) and sealed the various items that he handed to her. CNA Cragg testified that she observed that Cindy's vagina was swollen and inflamed and that there was bleeding.

Doctor Christine Barron, who was qualified as an expert in the field of sexual abuse, testified at trial; she gave her testimony over defendant's objection (which had also been the subject of a motion in limine). Doctor Barron had been retained by the prosecution to review Cindy's case. She reviewed all of the medical records for March 18, 2007, Cindy's previous medical records, State Police investigative reports (which included multiple witness statements), and the grand jury transcripts of Cindy's testimony. Doctor Barron also interviewed Cindy and performed a physical examination of her on May 21, 2007; the physical examination revealed that there had previously been "penetrating vagina trauma to cause trauma to the hymen with loss of tissue there." Doctor Barron also testified that the manner in which Dr. Corl had performed the sexual assault kit and recorded his findings fell below what she considered to be

the standard of care. Doctor Barron testified that, based upon Cindy's complaints of vaginal pain and the reports of bleeding, swelling, and bright red blood, the evidence from March 18 was consistent with "acute penetrating vaginal trauma."

Testimony at trial, based upon DNA evidence, indicated that defendant's seminal fluid was present on the inside of the boxer shorts that Cindy had been wearing on the evening of March 17, 2007. In addition, video stills showing Cindy following defendant into the substation in the early morning of March 18 were entered into evidence; evidence of defendant's key card having been used to access the police substation on March 17 and March 18 was also admitted.

Other facts relevant to the appeal will be provided as necessary in the course of this opinion.

**B**

**The Criminal Proceedings**

On August 1, 2007, a statewide grand jury indicted defendant, alleging that, on March 18, 2007, he "engage[d] in sexual penetration, to wit, vaginal penetration, with [the complaining witness], a woman not his spouse, at a time when he knew or had reason to know that she was mentally incapacitated, mentally disabled, or physically helpless, in violation of" G.L. 1956 §§ 11-37-2 and 11-37-3. Prior to trial, defendant filed a motion to dismiss the indictment. (The denial of that motion is one of the issues that defendant raises on appeal.)

The defendant's trial began in March of 2010 and lasted for approximately a month. During defendant's trial, the trial justice decided two substantive motions (which are also subjects of defendant's appeal)—viz., a motion to pass the case and a motion in limine to exclude testimony.

**1**

**The Defendant's Motion to Dismiss the Indictment**

On May 14, 2008, long before the trial began, defendant filed a motion to dismiss the indictment because of defects in the grand jury record; he contended that the recording of the grand jury proceedings contained "significant gaps in testimony" and was, "for the most part, inaudible." The defendant argued that those gaps and other inaudible testimony violated his right to due process because he was not provided with a sufficient record of the grand jury proceedings. On September 3, 2009, defendant's attorney and the prosecutor appeared for a hearing on defendant's motion to dismiss the indictment (or, in the alternative, to preclude witnesses who testified before the grand jury from testifying at trial). The motion justice[3] noted the following about the grand jury record: "There are numerous instances within the transcript where a witness'[s] testimony was inaudible and it is so reported in those words and in the transcript." The motion justice considered the record and the testimony "in its totality," and he determined that defendant was on notice as to what type of testimony was absent from the record and that defendant could have inferred the essence of the missing testimony based upon the exhibits attached to the proceedings and other surrounding context. He then denied defendant's motion.

**2**

**The Defendant's Motion to Pass the Case Based upon Rule 16 Violations**

While she was being cross-examined at trial, Cindy testified that she had spoken multiple times to the lead investigator, Sgt. Michelle Kershaw of the Rhode Island State Police. Defense counsel objected, citing Rule 16 of the Superior Court Rules of Criminal Procedure. The trial

---

[3] We note that the motion justice who presided over defendant's motion to dismiss the indictment was not the justice who presided over the trial.

justice allowed examination of the lead investigator to determine whether the fact of Cindy's multiple conversations with Sgt. Kershaw had been disclosed. The cross-examination of Cindy continued and then concluded, at which point the prosecutor proceeded to redirect the witness concerning certain portions of her testimony. During that redirect examination, the prosecutor, referring to the police substation in which the sexual assault had allegedly occurred, asked Cindy whether she had "been back inside that building since this happened." The record of the redirect examination continues as follows:

> "A  Um, I had to go in there once to just show it to some—I don't know the guy's, like what their job is, but I had to show it to some guys in the beginning. Then I've never been back.
> "Q  So do you mean right after you reported this, you took somebody there?
> "A  I had to show—some guys came in to me to take pictures of the building or something to show them where I was at. I had to show them where I went, like direct them.
> "Q  Were you with Detective Kershaw?
> "A  I believe so.
> "Q  Okay. But other than since around the time that this occurred back in 2007, have you been back in that building?
> "A  No.
> "Q  Okay."

After that portion of testimony, defense counsel asked for a sidebar conference. Both parties agreed that Cindy's testimony about returning to the building had been unexpected. Defense counsel argued that that information was "discoverable material" which should have been turned over to the defense. The prosecutor finished her redirect examination of Cindy, and the parties returned to the issue of whether additional information should have been turned over to the defense. The trial justice delayed ruling on the alleged Rule 16 violation until Sgt. Kershaw could examine her notes for additional information that had not previously been disclosed.

Sergeant Kershaw located a number of pages of notes in her possession; almost sixty pages were then turned over to the defense. Sergeant Kershaw's notes made reference to a

number of previously undisclosed facts, including the fact that Cindy had returned to the substation after the day of the incident at issue (which visit, defendant contended, sharpened her memory as to the physical features of the substation). In addition, the information revealed that an ultraviolet light test had been conducted in a bathroom at the substation; that test disclosed no fluids—a fact which, defendant contended, was clearly exculpatory and should have been previously disclosed.

Defense counsel moved to pass the case and also moved to dismiss the case. Over two days, the trial justice, the prosecutor, and defense counsel discussed each "new" item from Sgt. Kershaw's notes and the arguments by each of the parties. Defense counsel argued that his motions should be granted based upon the "volume and cumulative effect of the nondisclosure." He argued that certain information gleaned from the notes (including the fact of Cindy's subsequent return to the substation) would require him to alter the defense strategy that he had decided upon during his lengthy preparation for the trial. Defense counsel conceded, however, that the prosecutor had likely not deliberately violated Rule 16. The trial justice noted that defense counsel had not made the same concession about deliberateness with respect to Sgt. Kershaw, and she also noted that counsel had "suggest[ed] that Sergeant Kershaw of the State Police made selective disclosures to benefit the Prosecution." The trial justice did not accept defense counsel's suggestion as to Sgt. Kershaw's motivation; instead, she found Sgt. Kershaw's "omissions" to "have been negligent but not deliberate." With respect to Sgt. Kershaw's failure to have produced the information, the trial justice found that she "did not do so in an effort to buttress the State's case."

In rendering her decision on defendant's motions, the trial justice found that "there were violations of Rule 16." After considering "each and every item referred to in the 59 pages of

handwritten notes that had not been previously contained in a narrative or otherwise disclosed," as well as the complaining witness's testimony and the email revealing the ultraviolet light test, the court determined that, "in spite of the aforementioned failure to disclose information and material in a timely manner [and] in spite of the fact that it was disclosed at trial in this particular case," defendant "did not suffer prejudice." The trial justice noted that the information gleaned from Sgt. Kershaw's notes was either not highly significant or did not require further investigation and was produced before the material "would have been utilized by" defendant. She did, however, note one exception—namely, the "information concerning the complaining witness'[s] second visit to the substation." In determining that defendant had not been prejudiced by the late disclosure of that information, the trial justice noted that the complaining witness was still on the witness stand and subject to further cross-examination. The court stated that it would "permit broad recross-examination and [would] give the Defendant a full opportunity to question her on the issue of her second visit and on any other issue raised by the recent disclosures." The trial justice additionally noted that defendant had not yet given an opening statement and therefore had not yet "commit[ted] to a strategy that would have been altered by the disclosure."

With respect to defendant's motion to dismiss the indictment, the trial justice stated:

> "[A]bsent substantial prejudice and a showing that no other available discretionary measure can possibly neutralize the harmful effect of the Prosecutor's discovery violation, such remedy of dismissal of the charge generally will be avoided. And that's the case even when the Prosecution is guilty of gross negligent misconduct."

With respect to defendant's motion to pass the case, the trial justice stated:

> "There's nothing here to suggest that counsel for the State goaded the Defendant into a mistrial, which of course might impact on the issue of double jeopardy. Criminal discovery rule seeks to

> [promote] broader discovery by both sides in order to contribute to
> the fair and efficient administration of criminal justice. It is highly
> unfortunate that the State failed to provide full disclosure in a
> timely fashion. However, that failure was inadvertent on the part
> of the State, attorney for the State, and the Defendant has not been
> prejudiced."

The trial justice denied both of defendant's motions on Thursday afternoon; she had sent the jurors home the day before (Wednesday), and she had asked them to return on Monday. The trial justice indicated her willingness to allow defense counsel as much time beyond Monday as he wished; however, defense counsel stated that he did not "want the jury to attribute anything or suspect anything that's any delay based on the defense"; he said that he would therefore be ready to proceed the following Monday.[4]

**3**

**The Defendant's Motion <u>in</u> <u>Limine</u> to Exclude Dr. Barron's Testimony**

The defendant submitted a motion <u>in</u> <u>limine</u>, in which he sought to exclude the testimony of Dr. Christine Barron; the trial justice deferred ruling on that motion until later in the trial. In his memorandum of law submitted to the court, defendant contended that the state sought "to present Dr. Barron cloaked in the garb of a medical expert only to bolster, vouch for and prop up the hearsay testimony of a CNA and the complaining witness to arrive at the conclusion that penetration took place on the morning of March 18, 2007." The state's response to this contention was that the "degree of conclusiveness goes to the weight to be afforded the opinion, not its admissibility."

Later in the trial and prior to permitting Dr. Barron to testify, the trial justice allowed a voir dire examination of Dr. Barron to be conducted. After the voir dire examination, defense

---

[4]     One of the remedies available to a trial justice, upon a finding of a violation of Rule 16 of the Superior Court Rules of Criminal Procedure, is to grant a continuance. <u>See</u> Rule 16(i).

counsel argued (as a supplement to what he had contended in his written submission) that Dr. Barron's testimony constituted "impermissible vouching under [Rule] 803.4 [of the Rhode Island Rules of Evidence]." He additionally argued that the bases for Dr. Barron's opinion were "inherently unreliable" and that, therefore, her testimony was "inherently tainted." He asserted that the first mention of the "bright red blood," which was a basis for Dr. Barron's opinion that penetration had occurred, was at the grand jury, and not upon Cindy's presentation at the hospital. Additionally, he asserted that the "opinion on redness and swelling" was based upon CNA Cragg's statement, which was made nineteen days after the incident, and appeared nowhere in the medical record. He further argued that, because Dr. Barron reviewed all of the evidence, including police reports, witness statements, DNA results, and her own examination of the complaining witness, she had only "layers of hearsay" and no "first-hand knowledge that [the complaining witness] had been sexually assaulted." He asserted that, if Dr. Barron were allowed to testify as to the standard of care of Dr. Corl, her testimony would violate Rule 16 because that basis of her opinion had not been previously disclosed to defendant. He finally argued that, if permitted to "testify as proffered by the State," such testimony would be impermissible vouching.

The trial justice, in rendering her opinion, stated that she did not "find any of her testimony vouching. Her report, yes, but not her testimony." She then overruled the objection and denied the motion in limine.

## II

### Issues on Appeal

The defendant raises three issues on appeal. He asserts that the trial court erred: (1) in declining to dismiss the indictment based upon the partially inaudible and incomplete grand jury

record; (2) in not granting his motion to pass the case based upon Rule 16 violations by the state; and (3) in admitting the testimony of Dr. Christine Barron, which testimony he contends constituted impermissible vouching or bolstering of the complaining witness and CNA Cragg.

## III

## Standards of Review

With respect to a trial justice's decision on a motion to dismiss an indictment, we "accord[] great weight to [the] trial justice's * * * findings [and] we will not set them aside unless they are clearly erroneous or fail to do justice between the parties." State v. Sivo, 809 A.2d 481, 486 (R.I. 2002) (internal quotation marks omitted).

With respect to the imposition of sanctions after a finding of a Rule 16 violation, we review a trial justice's ruling "with deference and [we] will not overturn the decision unless it constitutes a clear abuse of discretion." State v. Gonzalez, 923 A.2d 1282, 1286 (R.I. 2007); see also State v. Garcia, 643 A.2d 180, 186 (R.I. 1994) ("[T]he determination of whether any harm has resulted from noncompliance with discovery motions and whether the harm can be mitigated is within the sound discretion of the trial justice."). We accord such deference to the trial justice in this context due to the fact that he or she "is in the best position to determine an appropriate sanction for a Rule 16 violation." Gonzalez, 923 A.2d at 1286.

We similarly review decisions concerning the admissibility of evidence under the abuse of discretion standard; we "will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent." See State v. Gaspar, 982 A.2d 140, 147 (R.I. 2009) (internal quotation marks omitted). Further, we review "a trial justice's ruling on the admissibility of an expert witness's proffered testimony" under the abuse of discretion standard. Id. at 153–54. Accordingly, we "will sustain the ruling below provided that the trial justice's discretion has

been soundly and judicially exercised, that is, if it has been exercised in the light of reason applied to all the facts and with a view to the rights of all the parties to the action * * *." Id. at 154 (internal quotation marks omitted).

# IV

## Analysis

### A

### The Defendant's Motion to Dismiss the Indictment

Rule 6(e)(1) of the Superior Court Rules of Criminal Procedure provides, in pertinent part, as follows:

> "All proceedings, except when the grand jury is deliberating or voting, shall be recorded stenographically or by electronic recording device. An unintentional failure of any recording to reproduce all or any portion of a proceeding shall not affect the validity of the prosecution. The recording or reporter's notes or any transcript prepared therefrom shall remain in the custody or control of the attorney for the State unless disclosed in the proper discharge of his or her official duties or otherwise ordered by the court in a particular case. In the event an indictment is not returned any notes of a stenographer and transcriptions of such notes, and any other recordings of the proceedings, shall be delivered to and impounded by the court."

We have "consistently declined to apply a per-se rule of dismissal of an indictment for violations of Rule 6(e)." State v. Cassey, 543 A.2d 670, 676 (R.I. 1988). We have also stated that "dismissal as a sanction for an alleged irregularity during the grand jury proceeding is an extreme remedy that is unwarranted except in limited and very rare circumstances." Id. However, defendant does not assert that an irregularity occurred during the grand jury proceedings. Instead, defendant argues that the failure of the state to record the entire proceedings or provide a complete record of those proceedings prejudiced him in his trial preparation to the point that a dismissal of the indictment was required. Rule 6(e)(1) itself

- 14 -

clearly states otherwise: "An unintentional failure of any recording to reproduce <u>all</u> or <u>any</u> portion of a proceeding <u>shall</u> <u>not</u> affect the validity of the prosecution."  (Emphasis added.) Here, there is no indication that the failure of the recording was intentional; accordingly, the gaps in the record <u>shall</u> <u>not</u> affect the validity of the prosecution.

In addition to adhering to the language of the rule itself, when reviewing a violation of Rule 6(e), we have cautioned against a trial court dismissing an indictment without looking to the "nature or the effect [of the violation] upon the quantum of evidence presented to the grand jury, the presence or absence of exculpatory information, or the ability of the defense to use grand jury testimony for impeachment purposes."  See <u>State v. Heredia</u>, 493 A.2d 831, 834 (R.I. 1985).  In this case, the motion justice made it clear that he had meticulously reviewed all of the grand jury transcripts.  He noted that there were "numerous instances within the transcript where a witness'[s] testimony was inaudible."  However, the motion justice also commented that, in reading the inaudible portions in their context, it was "apparent that many times one could fill in the blanks with regard to the missing passages in the transcript."  He based his denial of the motion upon his review of the transcript and "the fact that there were exhibits that accompan[ied] the witness[es'] testimony"; and, "given the totality of the information contained in the transcript, as well as the files and the exhibits contained [within it]," the motion justice denied the motion to dismiss the indictment against defendant.

We are of the opinion that the motion justice was not clearly wrong, nor did his decision fail to do justice between the parties.  See <u>Sivo</u>, 809 A.2d at 486.  An unintentional recording failure "shall not affect the validity of the prosecution."  See Rule 6(e)(1).  Although the grand jury record certainly contains gaps and inaudible words, we agree with the motion justice that defendant was not prejudiced to such an extent as to require dismissal of the indictment—an

"extreme remedy that is unwarranted except in limited and very rare circumstances." See Cassey, 543 A.2d at 676. We are of the opinion that this case falls within the ambit of Rule 6(e)'s provision that an unintentional failure to record or reproduce the proceedings does not affect the validity of the prosecution. Accordingly, we affirm the motion justice's denial of the motion to dismiss the indictment.

**B**

**The Rule 16 Violation and Ruling**

The defendant asserts that passing the case was the only appropriate remedy given the prejudice that resulted from "this surprise, mid-trial, mid-cross-examination disclosure." He additionally argues that the trial justice erred in relying so heavily on the inadvertent nature of the state's nondisclosure because the state should not reasonably have relied on Sgt. Kershaw to use her discretion in determining what information to furnish to the state.

We have stated that Rule 16 requires that the state, with respect to witnesses it intends to call at trial, turn over any of the witnesses' "prior recorded statements, a summary of their expected trial testimony, and any records of their prior convictions." DeCiantis v. State, 24 A.3d 557, 570 (R.I. 2011). However, we have also noted that "the state's discovery obligations extend beyond the literal language of Rule 16; * * * [w]hen evidence does not fit one of these three categories, but may nonetheless be helpful to defendant's effective cross-examination of a witness, a defendant's right to that evidence arises from the right of confrontation, and thus becomes an issue only when a defendant is improperly denied the ability to confront and to effectively cross-examine an adverse witness at trial." Id. (internal quotation marks omitted). This obligation, of course, is imposed by the Constitution, and not Rule 16; but we have stated that Rhode Island has "one of the most liberal discovery mechanisms in the United States." State

v. Oster, 922 A.2d 151, 163 (R.I. 2007) (internal quotation marks omitted).  One purpose of Rule 16 is to prevent surprise to either party at trial.  See id.

It is well established that "Rule 16 requires that discovery be made in a timely manner * * * in order that defense counsel may marshal the information contained in the discovery material in an orderly manner."  State v. Simpson, 595 A.2d 803, 807 (R.I. 1991).  We have also stated that a "criminal trial is a search for the truth; it is not a game of chess."  Oster, 922 A.2d at 163; see also State v. Langstaff, 994 A.2d 1216, 1219 (R.I. 2010) ("This Court has stated that the overarching purpose of Rule 16 is to ensure that criminal trials are fundamentally fair." (internal quotation marks omitted)).

Accordingly, Rule 16 "provides the trial justice with a range of sanctions for discovery violations," Gonzalez, 923 A.2d at 1286; the available sanctions include a continuance, a mistrial, or the entry of any other order as is necessary.  See Rule 16(i).  We have stated that, "[w]hen determining the appropriate sanction for a discovery violation, the trial justice should look to (1) the reason for [the] nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors."  State v. Botas, No. 2009-185-C.A., slip op. at 11 (R.I., filed April 23, 2013) (internal quotation marks omitted).

We agree with the trial justice that a violation of Rule 16 occurred in this case—certainly, information regarding the negative ultraviolet light test and regarding Cindy's return to the scene of the alleged crime along with her other statements should have been provided to the defense. However, it is equally clear that both the prosecution and the defense were surprised at trial by the new information; we are thus of the view that the record supports the conclusion that the nondisclosures were not deliberate on the part of the prosecutor.  The trial justice painstakingly

examined every new piece of evidence that was disclosed in the midst of the trial and heard argument from both parties. In particular, the trial justice determined that the violation could be remedied with a continuance (the duration of which was left to be decided upon by defense counsel) and by giving leave to defense counsel to conduct a "broad recross-examination" of Cindy. The trial justice's determination was based in part on the fact that the disclosures occurred during the complaining witness's testimony (while she remained on the stand for questioning) and the fact that defense had yet to make an opening statement wherein there might have been a commitment to a particular trial strategy or theory.

After careful consideration, we are of the view that the trial justice did not abuse her discretion in fashioning the remedy that she selected in connection with the violation at issue. She considered the reason for the nondisclosure (which she determined was not deliberate), the prejudice to defendant (which she determined was not so prejudicial as to warrant a mistrial), and the opportunity for further remedial preparation that a continuance would afford. In our opinion, the relatively early point in the trial when the nondisclosures were revealed and the lack of a commitment by the defense to a particular strategy by way of opening statement were properly taken into account in the trial justice's decision not to grant defendant's motion to pass the case. Those factors, in combination with the fact that a continuance was offered and liberal recross-examination was permitted, sufficiently addressed any prejudice to defendant. See Botas, slip op. at 12–13. Accordingly, it is our opinion that the trial justice did not abuse her discretion in refusing to pass the case, and we affirm her decision in that regard.

# C

## The Testimony of Dr. Christine Barron

The defendant also asserts that Dr. Barron's testimony should have been excluded, in its entirety, because it improperly bolstered the testimony of other fact witnesses. Although the state contends that defendant failed to preserve his argument as to bolstering, we are of the view that it has been properly preserved.

It is a fundamental principle that the "determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury." State v. Richardson, 47 A.3d 305, 314 (R.I. 2012) (internal quotation marks omitted). Testimony of the sort in which "one witness offer[s] an opinion regarding the truthfulness or accuracy of another witness'[s] testimony" is considered to be impermissible "bolstering" or "vouching." State v. Arroyo, 844 A.2d 163, 169 (R.I. 2004) (internal quotation marks omitted). We have noted that, "[o]rdinarily, a witness should not be permitted to offer an opinion concerning the truthfulness of the testimony of another witness, and his or her testimony will be inadmissible if it literally addresses credibility or has the same substantive import." State v. Lyons, 725 A.2d 271, 276 (R.I. 1999) (internal quotation marks omitted). We have further stated that "[i]mpermissible bolstering may occur even if the witness does not literally state an opinion concerning the credibility of another witness's testimony." Arroyo, 844 A.2d at 169 (internal quotation marks omitted).

At trial, prior to giving her expert opinion, Dr. Barron noted that Cindy's grand jury testimony described the presence of red blood; she also noted that the hospital documentation reflected that Cindy reported having experienced vaginal pain. Doctor Barron testified that bright red blood is inconsistent with "menses," but "is consistent with acute bleeding." Doctor Barron additionally stated that the witness statement of CNA Cragg and Cindy's grand jury

testimony contained information about Cindy's vaginal structure, to the effect that "there was vaginal redness" and "vaginal swelling." Doctor Barron also described the standard of care for performing a sexual assault kit. In the course of her testimony, she was asked to offer her opinion on Dr. Corl's performance of the sexual assault kit, and it was her opinion that Dr. Corl's performance fell below the standard of care.

With respect to the question of penetration, Dr. Barron testified that she had formed an opinion "based upon [her] training and experience" and "to a reasonable degree of medical certainty concerning [Cindy's] diagnosis on the morning of March 18, 2007." Her opinion was that the diagnosis was consistent with "acute penetrating vaginal trauma." She clarified that "acute" meant "recent." She based that opinion on her review of the "documentation of the patient's report of vaginal pain, bright red vaginal bleeding and vaginal structure swelling."

We have noted that, "[a]lthough our rules of evidence favor testimony that relates percipient observations rather than opinions, there are circumstances when opinion testimony is admissible," such as in the case of an expert witness. Richardson, 47 A.3d at 315. In the present case, defendant stipulated to the qualification of Dr. Barron as an expert in sexual abuse, and her testimony reflected that expertise. In particular, Dr. Barron's testimony reflected specialized knowledge about the performance of a sexual assault kit and about whether the evidence that she reviewed was consistent with sexual abuse. See id.

Similar to the situation addressed by this Court in Richardson, we must determine whether Dr. Barron's testimony, in relying on reports of pain, bleeding, and swelling, "has the same substantive import as bolstering." See Richardson, 47 A.3d at 315 (internal quotation marks omitted). In our opinion, Dr. Barron's testimony did not improperly vouch for or bolster the testimony of other witnesses because it did not address—either directly or indirectly—the

credibility or truthfulness of other fact witnesses.[5] See Arroyo, 844 A.2d at 170. Instead, Dr. Barron's testimony was in the form of an opinion of the medical diagnosis of Cindy based upon reports and statements regarding her medical condition. See Rule 703 of the Rhode Island Rules of Evidence.[6] Her testimony was within the realm of her medical expertise, and it did not rely on Cindy's account of what had occurred; instead, her opinion was based upon the medical evidence, which included specific complaints of vaginal pain and descriptions of blood and swelling. The jury was free to accept or reject that testimony, which was subject to vigorous cross-examination.

We are of the view that the trial justice did not abuse her discretion in permitting Dr. Barron's testimony or in revealing the bases of her opinion. Because the decision about the admissibility of such testimony is confided to the sound discretion of the trial justice, and because we do not believe that Dr. Barron's testimony constituted impermissible vouching or bolstering, we affirm the trial justice's ruling with respect to Dr. Barron's testimony.

---

[5]     We have duly considered defendant's assertion that his case presents a situation akin to the issue addressed by this Court in State v. Castore, 435 A.2d 321 (R.I. 1981). That case, however, is easily distinguishable. In Castore, the expert's opinion "was based, not upon his examination of [the complaining witness] or upon laboratory tests, but solely on what she had related to him about what went on within the walls of the * * * home." Id. at 326. By contrast, Dr. Barron's opinion was based upon reports and objective medical evidence such as complaints of pain and bleeding, and not on the complaining witness's account of the sexual assault. Unlike the opinion of the physician in Castore, Dr. Barron's opinion was based on evidence "within the realm of [her] medical capabilities or expertise." See id.

[6]     Rule 703 of the Rhode Island Rules of Evidence states:
> "An expert's opinion may be based on a hypothetical question, facts or data perceived by the expert at or before the hearing, or facts or data in evidence. If of a type reasonably and customarily relied upon by experts in the particular field in forming opinions upon the subject, the underlying facts or data shall be admissible without testimony from the primary source."

- 21 -

**V**

**Conclusion**

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction in this case.  The record may be returned to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:** State v. Marcus Huffman.

**CASE NO:** No. 2011-193-C.A.
(P2/07-2606A)

**COURT:** Supreme Court

**DATE OPINION FILED:** June 26, 2013

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Associate Justice William P. Robinson

**SOURCE OF APPEAL:** Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Netti C. Vogel

**ATTORNEYS ON APPEAL:**

For State: Christopher R. Bush
Department of Attorney General

For Defendant: Janice M. Weisfeld
Office of the Public Defender